**BERNAL, Admr., Appellant,**

v.

**LINDHOLM et al. Appellees.**

[Cite as *Bernal v. Lindholm* (1999), 133 Ohio App.3d 163.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–97–1315.

Decided March 12, 1999.

*James T. Murray, Joseph A. Zannieri* and *William Connelly,* for appellant.

*George C. Ward,* for appellee Patricia A. Lindholm, M.D.

*James E. Brazeau,* for appellee Community Health Services.

*Peter R. Casey III* and *Ann–Jeannine Foeller,* for appellee Joachim Gfoeller, M.D.

KNEPPER, Judge.

This is an appeal from the judgment of the Lucas County Court of Common Pleas that, following a jury trial, entered a defense verdict on appellant's medical malpractice claims. For the reasons that follow, we affirm the judgment of the trial court.

## STATEMENT OF FACTS

On December 7, 1987, appellant, Kathy Bernal, administrator of the estate of Renae Bernal, took her daughter Renae to the emergency room at Fremont Memorial Hospital ("the hospital"). Upon arrival, Renae was examined by Dr. Trung Pham, who diagnosed her as suffering from a viral syndrome and discharged her with instructions to see her family physician. On December 11, 1987, appellant took Renae to Community Health Services of Fremont, Ohio ("the clinic"), where she was examined by Dr. Patricia Lindholm who diagnosed her as suffering from probable left side pneumonitis and ordered a chest x-ray, which was taken that same day at the hospital. Joachim Gfoeller, M.D., a radiologist, reviewed the x-ray and communicated his findings to Lindholm. Renae was then sent home and instructed to take an oral antibiotic. The next day, on December 12, 1987, Lindholm's office telephoned Renae's home and, based on a conversation with Renae's mother, allowed her to remain at home. Renae died later that evening.

On December 12, 1987, the Sandusky County Coroner, Samuel R. Lowery, M.D., began an inquiry into the circumstances that caused Renae's death. As part of his investigation, Lowery ordered an autopsy that was performed by pathologist, R.S. Reeves, M.D., on December 13, 1987. Based on Reeves' post-mortem examination findings, the coroner rendered a verdict of death by "natural causes due to illness: Bilateral lobar pneumonia and # 2 Heart failure with pulmonary edema," and certified the same on Renae's certificate of death.

## STATEMENT OF CASE

Appellant filed a complaint on December 6, 1988, against Lindholm, the clinic, and the clinic's director, Dorothy J. Seeberger. Appellant claimed that Lindholm was negligent in her care and treatment of Renae in failing to adequately test and/or diagnose Renae's condition, failing to cause Renae to be hospitalized and/or perform further testing, and failing to properly monitor Renae's condition. Appellant also claimed that the clinic was vicariously liable because Lindholm's acts and omissions were committed in the course of her employment with the clinic and that said acts and omissions were committed in furtherance of the clinic's business. As director of the clinic, appellant alleged that Seeberger was

independently negligent in her capacity as Chief Administrative Officer in failing to monitor Lindholm, failing to establish appropriate procedures to assure that persons seeking medical care, treatment, and advice from the clinic would be properly examined, treated, and diagnosed, and failing to establish appropriate guidelines for referring patients to hospitals or other medical providers who present themselves with symptoms that the clinic was not designed to and/or was unable to respond to.

After conducting some discovery, appellant filed her first amended complaint on June 2, 1989, and added Gfoeller, Pham, and the hospital as defendants. Appellant averred that Gfoeller negligently misread the x-ray of Renae's lungs and failed to communicate to Lindholm the correct amount of fluid in Renae's lungs. Appellant claimed that Pham was also negligent in failing to properly diagnose Renae, order x-rays, and inform appellant of the severity of Renae's illness. With respect to the hospital, appellant claimed that it was liable for Gfoeller's and Pham's acts and omissions under the doctrine of *respondeat superior*. Appellant also added that the clinic was liable under the doctrine of *respondeat superior* for the acts and omissions of both Lindholm *and* Seeberger.

In April 1991, this matter came for trial before Judge J. Ronald Bowman. A directed verdict was entered on behalf of Pham. The jury returned a verdict in favor of all remaining defendants. This court overturned the April 1991 jury verdict on August 13, 1993, finding that the trial court abused its discretion in denying appellant's motion for continuance of the trial date to obtain the expert testimony of Dr. Robert Reeves. *Bernal v. Lindholm* (Aug. 13, 1993), Lucas App. No. L-91-167, unreported, 1993 WL 310437. The remainder of appellant's assignments of error were rendered moot by this reversal. Appellant never raised any assignment of error regarding Pham or Seeberger.

Upon remand, appellant requested leave on August 1, 1994 to file a second amended complaint. Appellant asserted that it was necessary to amend the complaint because of the death of Gfoeller and substitute Gfoeller's executor as a party defendant. Leave to file appellant's second amended complaint was granted on November 4, 1994, and the sample amended complaint was accepted in its entirety.

In addition to substituting Gfoeller, appellant included additional claims for relief against the clinic. Appellant again averred that the clinic was responsible for Lindholm's negligent acts and omissions, but added that the clinic was also negligent in failing to monitor Lindholm, failing to establish appropriate procedures to assure that persons seeking medical care, treatment, and advice from the clinic would be properly examined, treated, and diagnosed, failing to establish appropriate guidelines for referring patients to hospitals or other medical providers who present themselves with symptoms that the clinic was not designed to

and/or was unable to respond to, and failing to monitor its physicians' workload to ensure that they were not overloaded.

Appellant also included in her second amended complaint that appellant obtained the services of Dr. Robert Frank to testify concerning the liability of Lindholm, Gfoeller, and the clinic. Recognizing that Frank "must qualify to testify under [R.C. 2743.43] and [Evid.R. 601(D)]," appellant stated in her complaint that Frank's practice consisted of seventy-five percent "active clinical practice," within the meaning of R.C. 2743.43 and Evid.R. 601(D). Appellant also stated her desire to have Dr. Ian Wilson qualify as an expert witness.

Seeberger and Pham were removed as defendants in the second amended complaint. Hence, in summation, on November 4, 1994, appellant claimed that Lindholm was negligent, the clinic was liable because Lindholm was its employee, the clinic was negligent for its administrative practices, the estate of Gfoeller was liable for Gfoeller's negligence, and the hospital was liable because Gfoeller was its employee. Appellant also claimed that these parties were liable to Renae's next of kin for damages due to loss of support, loss of services, loss of society, loss of inheritance, and mental anguish. In addition to these claims for relief, appellant stated her intention to call Frank and Wilson as experts.

On February 6, 1997, appellant requested leave to file her third amended complaint to join Ricardo Bernal, Renae's father, as a party plaintiff. The claims alleged in the third amended complaint were identical to those in appellant's second amended complaint. On March 26, 1997, the matter was re-assigned to Judge Bruce C. Huffman, retired visiting judge. On June 2, 1997, Judge Huffman granted appellant leave to file her third amended complaint.

A second trial commenced on June 9, 1997, before Judge Huffman. The jury again returned a defense verdict, finding that none of the defendants were negligent in their care and treatment of Renae.

Appellant timely appealed the judgment of the trial court and raises the following assignments of error:

"*Assignment of Error No. I*

"In the second trial, the trial judge repeatedly took the position that he would not question the decisions of the judge in the first trial. As a result, the trial judge repeated the errors of the judge that originally tried the case.

"*Assignment of Error No. II*

"The court refused to allow testimony which would have explained why Dr. Lindholm's expert, Dr. Calvin Kunin, deviated from his initial report to claim that Renae had died from causes other than pneumonia.

*"Assignment of Error No. III*

"The court refused to recognize the obvious coordination of the defendants. This led to prejudicial conduct.

*"Assignment of Error No. IV*

"The court erred by refusing to permit considerations of clinic negligence based on theories other than *respondeat superior* negligence of Dr. Lindholm.

*"Assignment of Error No. V*

"The court erred to the prejudice of plaintiff in its treatment of the testimony and records of Dr. Lowery, the county coroner.

*"Assignment of Error No. VI*

"The court erred by permitting the deceased Dr. Gfoeller's wife to sit as a defendant when she was not the personal representative of the estate.

*"Assignment of Error No. VII*

"The court erred prejudicially in the treatment of two experts proffered by plaintiff. As a consequence, plaintiff lost the testimony of one expert and had to find substitute testimony for the other expert."

Gfoeller filed a "cross-assignment of error," which states:

"The trial court erred when it denied defendant Gfoeller's motion for directed verdict because the plaintiff did not present any evidence that he departed from the accepted standard of medical care." [1]

## ASSIGNMENT OF ERROR I

Appellant argues that the Judge Huffman erred by repeating the rulings made by Judge Bowman in the original trial. Judge Huffman stated that he was not going to look over the shoulder of Judge Bowman and followed Judge Bowman's prior evidentiary rulings. Appellant asserts that Judge Huffman duplicated Judge Bowman's errors with respect to the following items:

"1. He refused to allow cross-examination of Dr. Lindholm's expert on the insurance-based origins of his opinion.

"2. He refused to recognize the coordination of the defense and mismanaged jury selection as a result.

"3. He refused to allow cross-examination on clinic mismanagement.

---

1. On October 19, 1998, appellant filed a motion to strike Gfoeller's reply brief because, in it, he replied to appellant's response to Gfoeller's "cross-assignment of error." Appellant argues that Gfoeller's "cross-assignment of error" was improper because no cross-appeal was filed. In our November 9, 1998 decision and judgment entry, we held in abeyance the ruling on appellant's motion pending the outcome of this appeal.

"4. He mismanaged the use of the testimony of the coroner.

"5. He refused to give proper instructions on the presumption arising from the coroner's verdict.

"6. He did not allow plaintiff to use two experts whose testimony had been proffered at the prior trial."

Collectively, appellees argue in response that appellant's first assignment of error is merely a collection of six separate incidents of alleged error that are incorporated in the remaining assignments of error. Appellees also argue that there is no authority in support of appellant's contention that the second trial judge must automatically reverse the rulings made by the judge in the first trial. Moreover, the trial court could only err if the rulings were incorrect. Because there was no finding that any of these rulings were in error in the first trial, according to appellees, there is no ground upon which to find Judge Huffman's rulings to be in error.

In reply, appellant argues, "The purpose of a new trial is to grant the party a rehearing of the questions in the trial court under conditions more favorable to their deliberate consideration than attended the first investigation." Citing, *Dayton & Union RR. Co. v. Dayton & Muncie Traction Co.* (1904), 72 Ohio St. 429, 436, 74 N.E. 195, 197. Additionally, appellant argues, "When a new trial is granted, it must encompass *all issues* that come into doubt by the tainted verdict." (Emphasis *sic*.) Citing, *James v. Murphy* (1995), 106 Ohio App.3d 627, 633, 666 N.E.2d 1147, 1150–1151. Because this court remanded this matter for a new trial, appellant asserts that the new trial should have resulted in a re-examination of all the issues under more favorable conditions.

We clearly did not reach the merits of appellant's assignments of error raised in her first appeal concerning evidentiary matters. As such, the trial court had no obligation to change or modify the former evidentiary rulings made by Judge Bowman. Moreover, the cases cited by appellant do not state that a trial judge is required to re-examine evidentiary rulings during a second trial, or that it is error not to do so. Accordingly, we find that each alleged error must be reviewed individually to determine if it constitutes reversible error. We therefore find appellant's first assignment of error not well taken.

## ASSIGNMENT OF ERROR II

In her second assignment of error, appellant argues that she should have been able to cross-examine Lindholm's expert witness, Dr. Calvin Kunin, concerning "the fact that his bronchial hemorrhage theory exonerated two doctors who were both insured by the same company which was paying him for the opinions he provided to the jury." Appellant argues that, initially, Lindholm blamed

Gfoeller for providing her with an "inaccurate" and "grossly understated" radiology report. Then, Kunin stated in a letter, dated November 23, 1990, that he "arrived at the conclusion that [Lindholm] conducted herself properly and according to the standards expected of a board certified family practitioner." Thereafter, at trial, Kunin testified that, in his opinion, Renae did not die from pneumonia, as the coroner determined; rather, she "suffocated on blood" that was in her larynx because of a bronchial or tracheal hemorrhage.[2]

Based on the foregoing, appellant asserts that Kunin's testimony changed between the time of his initial letter and his trial testimony. Appellant argues that this change was motivated by the fact that Lindholm and Gfoeller were insureds of the same insurance company. According to appellant, Kunin's testimony was of no use to the insurance company if it only exonerated Lindholm because the insurer would still have to cover Gfoeller if he was found negligent. Hence, appellant asserts that Kunin was able to exonerate both doctors by "devising his bronchial hemorrhage theory."

As such, appellant desired to cross-examine Kunin concerning this insurance connection. Relying on *Ede v. Atrium S. OB–GYN, Inc.* (1994), 71 Ohio St.3d 124, 642 N.E.2d 365, appellant argues that commonality of insurance interest between a defendant doctor and a medical expert witness was sufficiently probative of the expert's bias to clearly outweigh any potential prejudice that evidence of insurance might cause.

We disagree with appellant that Lindholm's and Gfoeller's insurance information should have been presented to the jury. The ruling of the trial court concerning the admissibility of such evidence will not be reversed unless there has been a clear and prejudicial abuse of discretion. *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 222, 24 O.O.3d 322, 324–325, 436 N.E.2d 1008, 1011–1012; and *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493–494.

We find that *Ede* is distinguishable from the case at hand because, in that case, the expert was insured by the same company as the doctor for whom he was testifying. Additionally, in *Ede,* the doctors participated in a mutual insurance company. Hence, because the expert and the defendant doctor for whom he was testifying shared in a common pool of liability loss, the expert stood to suffer an economic loss should the defendant doctor lose at trial.

In this case, however, there is no evidence that Kunin shared a commonality of interest with any appellee with respect to insurance or otherwise. Hence, there

---

2. Although Kunin referred to the hemorrhage as "bronchial," because the coroner found no blood in that area, Kunin stated that the blood must have come from Renae's trachea, which was not examined by the coroner.

is no showing that Kunin, as an expert, had any financial incentive to be biased in this particular case. There is also no showing or proffer that Kunin would not have been hired and/or paid had he failed to testify as he did. Accordingly, because there is no commonality between Kunin's insurance and appellees' insurance, *Ede* lends no support to appellant's argument that she should be permitted to introduce evidence that Lindholm and Gfoeller were both insureds of the same company.

Moreover, we find that the prejudicial effect of disclosing appellees' insurance information would outweigh any possible relevance it could have. If the jury knew that the same insurance company would have to pay, regardless of who was found liable, then the jury might not distinguish between the appellees, thereby prejudicing appellees. These appellees had a right to have the issue of their individual liability considered independently from one another's. Accordingly, we find appellant's second assignment of error not well taken.

## ASSIGNMENT OF ERROR III

Appellant argues in her third assignment of error that the trial court erred in failing to recognize the coordination of appellees. By failing to recognize that the appellees' defense was closely coordinated, appellant asserts that appellees were permitted to each obtain three peremptory challenges (for a total of nine), while appellant was limited to three. Regardless of appellees' coordination, appellant argues the trial court erred in not granting appellant a total of nine peremptory challenges. Finally, appellant asserts that the trial court's refusal to recognize the lack of adversity among appellees precluded and limited appellant from cross-examining defense witnesses.

Specifically, appellant argues that the coordination of appellees' defense is evidenced by the fact that no objection was made by any appellee concerning the conduct of any other appellee; that, although Lindholm initially blamed Gfoeller for Renae's death, she testified at trial that she was incorrect in her previous opinion that Gfoeller read the x-ray incorrectly and that she was wrong in thinking there were 1500 cc's of fluid in Renae's lungs; and that, at trial, Lindholm repudiated her prior deposition testimony that she absolutely would have hospitalized Renae if she had seen the x-ray. Appellant also asserts that the defense's efforts were clearly coordinated because: (1) although Lindholm initially partially blamed Pham for Renae's death, Lindholm announced she would call Pham during her defense,[3] (2) Dr. Janiak, who was initially retained to serve as an expert for Pham, testified on behalf of the clinic "without any preparation", and (3) Janiak accepted the testimony of Lindholm's witness, Laura Burkin, who

---

3. Ultimately, however, Pham never testified.

testified that she suctioned 300 cc's of bright red blood from Renae while attempting to clear Renae's airway. Finally, appellant asserts that appellees could not be adverse because they were represented by the same insurance company. Hence, if the jury found against any of the doctors, the same insurance company would have had to pay all damages, regardless of which doctor the damages were assessed against.

Gfoeller responds that his interests are antagonistic to and different from those of Lindholm. Gfoeller asserts that appellant expected Lindholm to implicate Gfoeller, thereby making appellant's case against him. In support of this assertion, Gfoeller points out that appellant had no independent expert witness to testify against him and only had Lindholm's testimony to establish liability. Moreover, Gfoeller asserts that, being a radiologist and not an internist, his expertise involved different medical specialties, with different standards of care than Lindholm's. Hence, according to Gfoeller, the jury could have determined that he was negligent and Lindholm was not, or that Gfoeller properly read the x-ray, but that Lindholm was nevertheless negligent in her care and treatment.

The clinic asserts that "not even by the greatest leap of imagination could one reasonably conclude the interests of Community Health Services are 'essentially the same' as Dr. Gfoeller and Dr. Lindholm." The clinic asserts that although it was potentially facing liability on the theory of *respondeat superior*, with respect to Lindholm's actions, appellant also attempted to establish that the clinic was independently liable for negligently overworking Lindholm and/or mismanaging the clinic.

Lindholm also responds that appellees' interests were not "essentially the same" because they all filed separate pleadings and motions, and were represented by separate counsel. Additionally, Gfoeller and Lindholm had a conflict concerning a key piece of evidence, the interpretation of an x-ray, which appellant's counsel "vigorously promoted and pursued." Lindholm also argued that appellant attempted to pursue a theory of negligence against the clinic that put Lindholm, its employee, and the clinic at odds by insinuating that Lindholm was overworked to the point of providing substandard care.

Civ.R. 47(B) provides:

"In addition to challenges for cause provided by law, each party peremptorily may challenge three jurors. If the interests of multiple litigants are essentially the same, 'each party' shall mean 'each side.'

"Peremptory challenges may be exercised after the minimum number of jurors allowed by the rules has been passed for cause and seated on the panel. Peremptory challenges shall be exercised alternately, with the first challenge exercised by the plaintiff. The failure of a party to exercise a peremptory

challenge constitutes a waiver of that challenge. If all parties or both sides, alternately and in sequence, fail to exercise a peremptory challenge, the joint failure constitutes a waiver of all peremptory challenges."

In *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 125, 512 N.E.2d 640, 644–645, citing, *Chakeres v. Merchants & Mechanics Fed. S. & L. Assn.* (1962), 117 Ohio App. 351, 355, 24 O.O.2d 131, 133, 192 N.E.2d 323, 326, the Ohio Supreme Court held:

" 'Under statutes which allow a specific number of challenges to "each party," the majority view is that those who have identical interest or defenses are to be considered as one party and therefore only collectively entitled to the number of challenges allowed to one party by the statute. * * * However, if the interests of the parties defendant are essentially different or antagonistic, each litigant is ordinarily deemed a party within the contemplation of the statute and entitled to the full number of peremptory challenges.' "

In considering whether the defendants in *LeFort* were entitled to three peremptory challenges each, the court noted that the facts in *LeFort* were different than those in *Nieves v. Kietlinski* (1970), 22 Ohio St.2d 139, 51 O.O.2d 216, 258 N.E.2d 454. In *Nieves*, the court found that plaintiffs who filed a common complaint, relied upon a singular statement of facts, and employed the same attorney to represent them should have been considered a single party for purposes of determining the proper number of peremptory challenges. *Nieves* at paragraph two of the syllabus. By contrast, in *LeFort* the court found as follows:

"[T]he record in this case indicates that each defendant filed separate replies and defenses. Each, as well, was represented by its own counsel. Nationwide and its agent, moreover, the record indicates, filed a separate motion for partial summary judgment wherein they alleged that they owed the LeForts no duty to inspect the home or warn of hazardous conditions. Each defendant, additionally, could attempt to prove that its conduct did not constitute negligent misrepresentation. Each defendant asserted allegations which, if proved, would absolve it from liability to the detriment of the others. In sum, the defenses asserted did not necessarily stand or fall together. See *Chakeres, supra,* at 356, 24 O.O.2d at 133, 192 N.E.2d at 326. Each defendant, therefore, pursuant to Civ. R. 47(B), was entitled to three peremptory challenges." *LeFort* at 125, 512 N.E.2d at 644.

In addition to the above considerations in *LeFort,* the court found that the plaintiff was not prejudiced by the trial court for having granted three peremptory challenges to each defendant because "no corporate defendant together with its agent or agents actually exercised more than three peremptory challenges." *Id.*

■ In this case, we find that the trial court did not err in granting each appellee three peremptory challenges. Appellees were represented by separate counsel and separate pleadings and motions were filed. See *LeFort, supra,* at 125, 512 N.E.2d at 644–645. With respect to the defenses asserted, the tracheal hemorrhage theory could have exonerated all defendants. However, if the jury chose not to accept that theory, it nevertheless could have found one defendant liable and not another. Hence, the defenses asserted did not necessarily stand or fall together. See *id.*

We also find that appellant's reliance on *Nieves, supra,* is misplaced. *Nieves* held that a finding of prejudice as a matter of law could be made where the plaintiffs exercised thirty peremptory challenges to the defendant's three. This conclusion, however, was based on the fact that the plaintiffs had identical interests. Because their interests were identical, plaintiffs should have been limited to three peremptory challenges as a group. *Nieves* is distinguishable from the case at hand because appellees did not have identical interests.

Additionally, unlike the Criminal Rules, there is no provision in the Civil Rules that provides for each side in a civil action to have an equal number of peremptory challenges. Moreover, we have previously declined to adopt such a rule. *Leber v. Smith* (Mar. 3, 1989), Erie App. No. E–87–43, unreported, 1989 WL 18141.

■ We further find that appellant suffered no prejudice from being granted only three peremptory challenges, to appellees nine, because appellees only exercised a total of two peremptory challenges. See *LeFort* at 125, 512 N.E.2d at 644–645. Hence, appellant was placed at no disadvantage and, thereby, suffered no prejudice, as a result of the trial court's award of only three peremptory challenges to appellant.

In addition to the preemptory challenges issue, appellant argues that, by its refusal to recognize the lack of adversity among defendants, the court denied and limited plaintiff's right to cross-examine defense witnesses. Although appellant couches her argument in terms of her being limited in cross-examining appellees' witnesses, the instances complained of by appellant actually concern appellees' examination of one another's witnesses. In general, appellant asserts that appellees bolstered each other's witnesses to appellant's detriment.

It is well settled that a trial court has broad discretion in determining whether to admit or exclude evidence. Thus, an evidentiary ruling will not be reversed unless there has been a clear and prejudicial abuse of discretion. *O'Brien,* 63 Ohio St.2d at 163, 17 O.O.3d at 100, 407 N.E.2d at 493–494. An abuse of discretion is more than an error of law or judgment; rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v.*

*Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1141–1142.

■ Even if appellees' examinations of one another's witnesses bolstered the defense for all appellees, we find that the trial court did not abuse its discretion, or prejudice appellant, in allowing appellees to examine one another's witnesses. A review of the record indicates that appellant was provided the opportunity to thoroughly cross-examine each of the defense witnesses. As such, appellant was provided a full opportunity for meaningful cross-examination of the witnesses.

■ Appellant, however, did complain of one instance when she tried to examine Kunin and was prevented from doing so. Appellant contends that she was attempting to have Kunin testify regarding when he was able to identify the bronchial/tracheal hemorrhage theory. The questioning was as follows:

"Q. Doctor, I am handing you Plaintiff's Exhibit 23, and could you identify that?

"A. It is a letter dated November 23rd, 1990, to Mr. Bamman regarding this particular case. Dear Mr. Bamman—it was sent by me.

"\* \* \*

"Q. Doctor, you are aware that that was given to me as your report of your analysis?

"A. I have a—I have hardly had a chance to read this thing.

"Q. Oh, take your time.

"A. Let's see, I was contacted just about that time, about October I think it was.

"MR. CASEY: Your Honor—

"THE COURT: Well, while the Doctor is reading to himself—

"MR. CASEY: What is the relevancy of this?

"THE COURT: We will find out in a minute.

"A. Let me read the letter. If I read the letter, what is going on? It says—

"THE COURT: No, read it to yourself.

"A. Oh, okay. Why?

"Q. Doctor, is that the initial report that you prepared in this matter?

"A. I think so. It probably looks like the early—if not the first, an early letter.[4]

---

4. The November 23, 1990 letter from Kunin to Attorney William Bamman provided as follows:

"Q. And, Doctor, would you accept from me, or do you recall the deposition? That's the only report I have.

"MR. CASEY: Objection, Your Honor.

"THE COURT: How would he know?

"MR. BAMMAN: Your Honor, may I approach the Bench, please?

"THE COURT: Sustained. Yes.

"(DISCUSSION held off the record at the Bench.)

"THE COURT: The objection was sustained, and Mr. Murray will state his reasons for the record later.

"MR. MURRAY: Thank you, Your Honor.

"MR. MURRAY: No further questions."

We find that the trial court did not abuse its discretion in this matter. Appellant thoroughly examined Kunin for over ninety pages of transcript. Although the bronchial/tracheal hemorrhage theory was not included in the letter, Kunin did state, "This was a most unusual case and all of the aspects need to be assessed carefully." Hence, it is apparent that there were additional matters Kunin intended to consider.

Moreover, a party may not predicate error on a ruling by the trial court to exclude evidence unless the ruling affects a "substantial right of the party" and "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Evid.R. 103(A)(2). This court is unable to ascertain from the questions asked and the discussion placed on the record what exactly appellant's counsel sought to achieve with this line of questioning, and appellant has not directed this court to any proffer made of record. Accordingly, appellant failed to establish what prejudice she suffered by the exclusion of the alleged testimony sought.

Based on the foregoing, we find that the trial court did not err in determining that appellees' interests were dissimilar. Moreover, we find that the trial court did not abuse its discretion, and/or appellant suffered no prejudice, with respect to the trial court's rulings concerning both the peremptory challenges issues and

---

"I have read carefully the material sent to me as described in your letter of November 16, 1990. I spent considerable time on the depositions, records and autopsy reports and have summarized them for later review. I have also read the pertinent literature concerning the diagnosis and management of community-acquired pneumonia. I have arrived at the conclusion that your client conducted herself properly and according to the standards expected of a board certified family practitioner.

"This was a most unusual case and all of the aspects need to be assessed carefully. I look forward to reviewing the x-ray films taken on 12/11/87. I am most pleased to continue to be of help to you and your client. My statement is enclosed."

the cross-examination issue. Accordingly, appellant's third assignment of error is found not well taken.

## ASSIGNMENT OF ERROR IV

■ In her fourth assignment of error, appellant argues that the trial court erred by refusing to permit consideration of clinic negligence based upon its own negligence, in addition to liability based upon the doctrine of *respondeat superior*. Specifically, appellant asserts that she was incorrectly restricted from cross-examining witnesses concerning the clinic's negligence with respect to over-loading Lindholm with too many patients.

Appellant cites two instances in the record where the trial court allegedly limited her cross-examination. In the first instance, appellant was cross-examining Lindholm, during appellant's case-in-chief, and the following exchange took place:

"Q. Did you get pressure from any sources to see numbers of patients that might have—that you might not have preferred to have seen on any given day?

"MR. BRAZEAU: Objection, Your Honor, may we approach the bench?

"THE COURT: No. I'm going to overrule your objection. She can answer.

"A. Could you repeat the question?

"Q. Yes, did you get pressure from any sources on occasion to see numbers of patients that you might have preferred not to have seen in terms of the number you had to see on a given day?

"A. At times, yes.

"Q. What did you do about that? Did you complain to anybody about it?

"A. I believe I did. I don't recall exactly by this time how I handled that.

"Q. Did you complain, also, too, about walk-ins?

"A. I can't recall anymore. It's been a long time."

Appellant's counsel then abandoned the topic and moved on to another.

Appellant asserts that she was limited in her cross-examination of Lindholm a second time, concerning the clinic's negligence, when the trial court ruled as follows:

"MR. MURRAY: We—I would move at this time that the Court reconsider it's ruling that I was not allowed to cross-examine Dr. Lindholm on the subject of her being pressured at the clinic in 1987.

"Mr. Bamman elicited from her on direct that the migrants were not around at that point, and used that as—to support the fact that this was not a busy day.

"I have testimony from Dr. Lindholm that was taken February 24th, 1989, in which she talks about—for the last two months she has been going on to the affect [*sic*] that the Court would give me the grace—that she goes on that she had to put her foot down. She presented the administrator with a fait accompli. I am not going to take any more patients. She testifies in February 24th, 1989, that this was what was happening two months prior to this deposition, which would have been—put it in December/January time when either the—obviously, the migrants aren't there either.

"I think he has opened the door, and I think I should be granted the opportunity to talk about what—and to be able to use it to challenge her testimony that this was a very, very slow day.

"MR. BAMMAN: May I say something, Your Honor?

"THE COURT: I am trying to find the motion that. Let's see—I don't see the motion. Was it an oral motion or written motion?

"MR. MURRAY: No, this was an oral motion they made. I believe an oral motion to prohibit me from talking about the atmosphere at the clinic because of the so-called pressure.

" * * *

"MR. MURRAY: My recollection is, Judge, that we approached the Bench and they made a motion based upon the fact that there was no evidence—I had no evidence of that day, December 11th, 1987. I had no evidence that there was pressure on Dr. Lindholm as of that date.

"And you agreed and said I couldn't examine—I couldn't talk any further on the issue of what kind of pressure she was under. He has now opened the door on that subject because he said—he elicited it from her.

"THE COURT: All right. Let me hear from you?

"MR. BAMMAN: The only reason I brought that up—I didn't open the door. On the original cross-examination, he brought up the fact that Dr. Lindholm was pressured, and she had been pressured on other occasions.

"There has never been any testimony that she sustained any pressure this day at all. Because he brought it up on cross, I brought that out that on this day there was no problem. And really that's the only relevant thing in reference to this case, because we are not talking about any independent negligence from Community Health Services.

"Once more, we are only talking about Dr. Lindholm, what was going on that day.

"THE COURT: I think my ruling will be that you may cross-examine her on the basis of that activity that day, whether she was under any pressure that day or the day before or the day after, something like that. That will be it."

We find, in the first instance, that appellant was clearly not prohibited from questioning Lindholm concerning her working conditions. Moreover, the trial court overruled appellee's objection to that line of questioning and allowed counsel to question Lindholm regarding the number of patients she saw on "any given day." Hence, appellant was not limited in her examination. Lindholm simply did not recall whether or how she complained to her superiors concerning her having to treat more patients than she preferred "on a given day."

To the extent that appellant may have later been limited in her examination, in the second instance cited, we find that the trial court did not abuse its discretion. See *O'Brien*, 63 Ohio St.2d at 163, 17 O.O.3d at 100, 407 N.E.2d at 493–494. The essence of appellant's claim against the clinic, other than upon a theory of *respondeat superior*, was that the clinic overworked Lindholm by having her treat an excessive number of patients. We find that the relevant time period for determining the clinic's liability in this regard was correctly limited to the several days around the time that Lindholm treated Renae. The fact that the clinic may have overworked Lindholm at other times would be irrelevant to whether Renae received substandard care on the day she was treated. Regardless of its relevance, however, appellant, in fact, was allowed to examine Lindholm concerning whether she was overworked on "any given day" and how she handled that situation.

Hence, we find that appellant was permitted to cross-examine Lindholm concerning possible negligence on behalf of the clinic. However, to the extent that appellant may have later been limited in her examination, we find that the trial court did not abuse its discretion. Accordingly, appellant's fourth assignment of error is found not well taken.

### ASSIGNMENT OF ERROR V

In her fifth assignment of error, appellant argues that the trial court erred to her prejudice in its treatment of the testimony and records of Dr. Samuel Lowery, the Sandusky County Coroner. Appellant makes three separate arguments with respect to Lowery's testimony: (a) the trial court erred in using an unattested, poor quality video of Lowery in place of a stenographically transcribed transcript, (b) the trial court erred in allowing appellees to cross-examine Lowery because he was their own witness, and (c) the trial court erred by refusing to give instructions on the legal significance of the coroner's report and by refusing to instruct on the burden of production and proof required to overcome that report.

## A. Use of Videotaped Deposition of Lowery

Appellant asserts that she gave notice to appellees that she was going to take a stenographic discovery deposition of Lowery. Then, without notifying appellant, appellees arrived with a video cameraman who proceeded to videotape the deposition. Appellant asserts that the quality of the video and audio was poor. Additionally, appellant argues that the video operator did not follow the Ohio Civil Rules with respect to videotaping depositions. According to appellant, appellees used the deposition to cross-examine Lowery. Appellant also asserts that she objected to the use of the videotape at trial, in lieu of the transcribed deposition; however, in following the decision of Judge Bowman, Judge Huffman allowed the tape to be played.

Appellant argues that if a party taking a deposition wishes to record the deposition by means other then stenography, "the notice shall specify the manner in which the recording shall be taken," citing Civ.R. 30(B)(3).[5] Additionally, appellant asserts that "[t]he officer before whom the deposition is to be taken shall put the witness on oath or affirmation and shall personally, or by someone acting under his direction and in his presence, record the testimony of the witness," citing Civ.R. 30(C). Appellant also asserts that the purpose of the notice requirement is to prevent surprises and to ensure the accuracy of the recording of the testimony by identifying the person who is authorized to take the deposition. Because the stenographer placed Lowery under oath and because the stenographer neither made the video recording or supervised the video recording, appellant argues that Civ.R. 30(C) was not satisfied.

Appellant also argues that appellees did not comply with the following rules:

"(2) *Notice.* The notice requirements of Civil Rule 30(B)(3) regarding the manner of recording, preserving, and filing depositions apply to videotape depositions. Notice is sufficient if it specifies that the videotape deposition is to be taken pursuant to the provisions of this rule.

"(7) *Submission to Witness.* After a videotape deposition is taken, the videotape shall be shown immediately to the witness for his examination, unless the examination is waived by the witness and the parties.

"(8) *Certification of Original Videotape Deposition.* The officer before whom the videotape deposition is taken shall cause a written certification to be attached to the original videotape. The certification shall state that the witness was fully

---

**5.** Civ.R. 30(B)(3) states:

"If a party taking a deposition wishes to have the testimony recorded by other than stenographic means, the notice shall specify the manner of recording, preserving, and filing the deposition. The court may require stenographic taking or make any other order to ensure that the recorded testimony will be accurate and trustworthy."

sworn or affirmed by the officer and that the videotape is a true record of the testimony given by the witness. If the witness has not waived his or her right to a showing and examination of the videotape deposition, the witness shall also sign the certification." Sup.R. 13(A)(2), (7), and (8), effective July 1, 1997, formerly C.P.Sup.R. 12(A)(2), (7), and (8).

In response, appellees collectively argue that appellant's objection to the videotape is as to its quality, not content, and that appellant failed to demonstrate how she was prejudiced by the quality of the tape. With respect to the taking of the videotaped deposition, appellees state that (1) appellant, not appellees, gave notice to Lowery for his deposition and was, therefore, responsible for giving notice as to the recording method, (2) appellant knew for forty-five minutes prior to the taking of the deposition that a videographer was there to videotape Lowery's deposition, (3) appellant never objected at the time of the deposition to having it videotaped, and thereby waived her right to do so, and (4) Lowery was placed under oath at the time of his deposition by the individual who recorded the deposition stenographically. Hence, appellees assert that Lowery was under oath at the time of his deposition, that his testimony was in compliance with the Civil Rules, and that any potential error was harmless.

Pursuant to Civ.R. 32(D)(3)(b), a party must object at the time of the deposition or her right to object is waived:

"Errors and irregularities occurring at the oral examination *in the manner of taking the deposition,* in the form of the questions or answers, *in the oath or affirmation,* or in the conduct of parties and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless reasonable objection thereto is made at the taking of the deposition." (Emphasis added.)

No objection was made at the time of Lowery's deposition concerning the videotaping. Accordingly, appellant waived her right to object. Moreover, because appellant disputes only the form of the deposition, but not the content, we find that appellant has failed to demonstrate how she was prejudiced in this instance by the quality of Lowery's deposition.

### B. Cross-examination of Dr. Lowery by Appellees

Appellant argues that the trial court erred in allowing appellees to cross-examine their own witness. According to appellant, Lowery was not appellant's witness; however, appellees were nevertheless permitted to "exhaustively cross-examine Dr. Lowery." Appellant asserts that because Lowery's videotaped deposition was used during appellees' case-in-chief, he was their witness and, therefore, appellees should not have been allowed to cross-examine him. Besides, appellant argues, Lowery's testimony was unnecessary and cumulative because

Reeves, who actually conducted the autopsy, testified live concerning the cause of death.

In response, appellees collectively argue that Lowery was called by appellant as an expert witness. Hence, appellees were entitled to cross-examine Lowery following appellant's direct examination. As a medical expert, appellees argue, any part of Lowery's deposition can be used by any party for any purpose. See Civ.R. 32(A).

We agree with appellees. Civ.R. 32(A) states:

"At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions:

" * * *

"(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * (e) that the witness is an attending physician or medical expert, although residing within the county in which the action is heard * * *."

Appellant was present and examined Lowery at his deposition. Following cross-examination of Lowery, appellant re-directed Lowery twice. Upon reviewing Lowery's testimony, we find that Lowery, who observed and assisted during Renae's autopsy, was clearly called as a medical expert as he was asked to render medical opinions within a reasonable degree of medical probability. Accordingly, pursuant to Civ.R. 32(A), we find that the trial court did not err in permitting appellees to use Lowery's deposition testimony in their case-in-chief.

■■■■ Additionally, appellant asserts on appeal that Lowery's testimony was unnecessary and cumulative because Reeves, who actually conducted the autopsy, testified live concerning the cause of death. We find, however, that the trial court did not abuse its discretion in admitting Lowery's testimony. See *O'Brien*, 63 Ohio St.2d at 163, 17 O.O.3d at 100, 407 N.E.2d at 493–494. Lowery was a qualified expert and the county coroner.

## C. Instruction Concerning Coroner's Report

Appellant argues that the trial court erred by not instructing the jury with the following proposed jury instruction:

"You are instructed that the coroner's verdict and death certificate are, by law, the legally accepted statements on manner or mode of death. (Ohio Rev.Code.

Section 313.19). You are instructed that they may be overcome only by assertion of competent, credible evidence to the contrary. (*Vargo v. Travelers Ins. Co.*, 34 Ohio St.3d 27, 30 [516 N.E.2d 226, 229–230] [1987]).

"You are further instructed that when a party asserts the affirmative of an issue, that party must bear the burden of establishing that issue by a preponderance of the evidence. That rule applies equally to defendant and plaintiff. (*Davis v. Gray*, 17 Ohio St. 330, 350 [1867 WL 20] [1867]). Defendants have asserted that Renae Bernal died of a pulmonary hemorrhage. Having asserted the affirmative of that proposition, they are bound to prove it by a preponderance of the evidence. (17 Ohio St. [at] 350). [T]his does not shift the burden of proof on all issued [*sic*] to defendant. It shifts only the burden of proof on this particular issue, that is, the issue of whether Renae Bernal died by bronchial hemorrhage. (Ohio Rules of Evid. 301)."

Appellant asserts that pursuant to R.C. 313.19 and *Vargo v. Travelers Ins. Co.* (1987), 34 Ohio St.3d 27, 516 N.E.2d 226, this is a correct statement of the law. Because the coroner stated that Renae died of untreated pneumonia, appellant asserts that the burden of proof should have then shifted to the defense to prove that Renae died of a bronchial hemorrhage. By not shifting this burden to appellees, appellant argues that she was thereby required to disprove the bronchial hemorrhage theory of death.

Appellees collectively respond that, pursuant to Civ.R. 51, appellant cannot assign as error the trial court's failure to give the requested instruction because appellant failed to object to the instructions prior to the jury retiring to consider its verdict:

"On appeal, a party may not assign as error the giving *or the failure to give* any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury." (Emphasis added.) Civ.R. 51(A).

Assuming *arguendo* that appellant did object to the trial court's refusal to read her requested instruction, appellees argue that the proposed instruction was an incorrect statement of the law. Appellees assert that, pursuant to *Vargo*, the coroner's factual findings are not binding upon the jury as a matter of law; rather, they merely create a rebuttable presumption concerning the cause of death. Hence, contrary to the first paragraph of appellant's proposed instruction, appellees argue that the Ohio Supreme Court did not hold that the coroner's verdict and death certificate can only be overcome by the assertion of competent, credible evidence.

With respect to the second paragraph of appellant's requested instruction, appellees argue that it is a misstatement of the law because the burden of proof concerning the cause of death never shifts to the defendant and always rests upon the plaintiff. Citing *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673.

■ A jury instruction may not be challenged on appeal unless a specific objection is raised prior to deliberations. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001, paragraph one of the syllabus; Civ.R. 51(A). Upon reviewing the record, we find that appellant failed to enter an objection concerning the jury instructions. Thus, any error is reversible only if it amounts to plain error.

The Supreme Court of Ohio has limited the application of the plain error doctrine in civil cases:

■ "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus.

■ The plain error doctrine is utilized in civil matters only under exceptional circumstances to prevent a manifest miscarriage of justice. *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.* (1985), 18 Ohio St.3d 268, 275, 18 OBR 322, 327–328, 480 N.E.2d 794, 800.

Initially, we note that there is no authority supporting the law stated by appellant in the second paragraph of her proposed jury instruction. The case relied upon by appellant, *Davis v. Gray* (1867), 17 Ohio St. 330, 350, is factually distinguishable from this case. *Davis* concerns a contractual matter and has nothing to do with burdens of proof or affirmative defenses in a medical malpractice matter.

Additionally, the Ohio Supreme Court stated in *Vargo* that R.C. 313.19 did not compel the factfinder to accept, as a matter of law, the coroner's factual findings concerning the manner, mode, and cause of decedent's death. *Vargo,* 34 Ohio St.3d 27, 516 N.E.2d 226, at paragraph two of the syllabus. Rather, the Supreme Court held:

"The coroner's factual determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, *create a nonbinding rebuttable presumption concerning such facts in the absence of*

*competent, credible evidence to the contrary.* (R.C. 313.19, construed.)" (Emphasis added.) *Vargo* at paragraph one of the syllabus.

We find that based on the facts presented in this case, even if the jury had been instructed as appellant requested, the jury nevertheless could have concluded that appellees were not negligent. The coroner's determinations were "nonbinding" and created a "rebuttable presumption" concerning the manner, mode, and cause of death. See *Vargo, supra.* Even assuming the jury reached a conclusion concerning Renae's death, appellees presented the jury with competent, credible evidence suggesting a cause of death other than pneumonia. We further find that the jury was properly instructed regarding consideration of expert testimony in general. Accordingly, we find that plain error does not exist in this case.

Based on the foregoing discussion of the three subparts to appellant's fifth assignment of error, we find the entire assignment of error not well taken.

## ASSIGNMENT OF ERROR NO. VI

Appellant argues in her sixth assignment of error that the trial court erred in allowing Gfoeller's widow to sit at counsel table. Specifically, appellant asserts that only the executor of Gfoeller's estate should have been permitted to sit with counsel, as he was the actual party. Appellant asserts that she suffered prejudice by Mrs. Gfoeller's presence because it induced sympathy for the decedent doctor.

Although the executor was properly named as a defendant in place of Gfoeller, following his death, we find that the trial court did not err in permitting Gfoeller's wife to sit at counsel table. There is no rule prohibiting a decedent's spouse to be present at trial to represent the decedent's estate. Moreover, Mrs. Gfoeller was not present to testify. Appellant argues that the executor should have been the only person allowed to represent the estate, because he was named as the actual party; however, as the trial court reasoned, "If the secretary of the executor was here in the courtroom representing, [she] would be permitted to sit at counsel table."

Additionally, we have previously declined to find error when a nonparty has been seated at counsel table. See *Marr v. Mercy Hosp.* (May 22, 1998), Lucas App. No. L–97–1160, unreported, 1998 WL 336923. In *Marr*, the hospital had designated a nurse to represent it at counsel table. In addition to the nurse, who was the alleged negligent party, the nurse's husband sat with her. We held that "[a]ppellant's argument as to any erroneous impression the presence of this nurse had on the jury amounts to nothing more than speculation." We further held, "If

appellant believed such an erroneous impression existed, he could have asked for a curative instruction."

In this case, we again find that the alleged prejudice suffered by appellant amounts to nothing more than speculative concerns regarding sympathy from the jury. Appellant could have requested the trial court to give a curative instruction in this respect; however, no such request was made. Accordingly, we find appellant's sixth assignment of error not well taken.

## ASSIGNMENT OF ERROR VII

Appellant asserts in her seventh assignment of error that the trial court erred in its treatment of two experts proffered by appellant. Specifically, appellant argues that the trial court erred by refusing to permit Frank to testify as a liability expert or fact witness. Appellant also argues that the trial court erred to her prejudice by refusing to allow Dr. Camille Wortman to testify regarding the issue of damages.

Prior to the commencement of trial, the trial court denied appellant's request to allow Frank or Wortman to testify. This court does not directly review the rulings on motions *in limine*. A pretrial ruling on such a motion is a preliminary precautionary ruling by a court in anticipation of its ruling on evidentiary issues at trial. *State v. Grubb* (1986), 28 Ohio St.3d 199, 201–202, 28 OBR 285, 287–289, 503 N.E.2d 142, 145–146; *McCabe/Marra Co. v. Dover* (1995), 100 Ohio App.3d 139, 160, 652 N.E.2d 236, 249–250. The denial of a motion *in limine* does not preserve any error for review. *State v. Hill* (1996), 75 Ohio St.3d 195, 202–203, 661 N.E.2d 1068, 1077–1078. As stated in *Grubb:*

"At trial it is incumbent upon a [party], who has been temporarily restricted from introducing evidence by virtue of a motion *in limine,* to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." *Grubb,* paragraph two of the syllabus. See, also, *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 141, 624 N.E.2d 704, 706–707.

Upon a review of the record, we find that appellant failed to proffer any evidence concerning Frank's or Wortman's testimony. As such, appellant has waived her right to argue on appeal that the trial court improperly excluded their testimony. See *Garrett, supra.* Accordingly, appellant's seventh assignment of error is found not well taken.

GFOELLER'S "CROSS–ASSIGNMENT OF ERROR"

In the event that we found in favor of any of appellant's assignments of error, Gfoeller asserted that the trial court erred in not granting a directed verdict in his favor. Insofar as we affirm the defense verdict, Gfoeller's "cross-assignment of error" is rendered moot and, therefore, denied. Accordingly, we deny appellant's motion to have Gfoeller's reply brief stricken as any arguments contained therein are also rendered moot.

## JUDGMENT

On consideration whereof, the court finds substantial justice has been done the party complaining and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.

*Judgment affirmed.*

HANDWORK, P.J., and MELVIN L. RESNICK, J., concur.