STEWART, Exr., et al., Appellants,

v.

CLEVELAND CLINIC FOUNDATION et al., Appellees.

[Cite as *Stewart v. Cleveland Clinic Found.* (1999), 136 Ohio App.3d 244.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 75430.

Decided Dec. 6, 1999.

*Amer Cunningham Brennan Co., L.P.A., Richard T. Cunningham, Thomas R. Houlihan, Leonard W. Stauffenger, John C. Weisensell, E. Marie Wheeler,* for appellants.

*Bonezzi, Switzer, Murphy & Polito Co., William D. Bonezzi, Steven J. Hupp, Edward E. Taber,* for appellees.

James D. Sweeney, Judge.

Plaintiffs-appellants appeal from the trial court order granting summary judgment in favor of defendants-appellees. For the reasons adduced below, we affirm in part, and reverse and remand in part.

A review of the record on appeal indicates that Mr. Daniel Klais utilized the Cleveland Clinic Foundation ("Cleveland Clinic") as his medical care provider. During Klais' annual physical examination in March 1990, his primary family practice physician at the Cleveland Clinic, Dr. Cheryl Weinstein, diagnosed as a cyst two centimeter by two centimeter nodule found on his neck. During a subsequent visit on May 21, 1990, Weinstein observed further swelling on the patient's neck and two additional nodules. At this point, Weinstein suspected a cancerous condition and referred the patient to Cleveland Clinic Dr. Pierre LaVertu, who specialized in head and neck oncology. The biopsy of the suspect site ordered by LaVertu on Klais's neck indicated Stage IV squamous cell carcinoma originating at the base of the tongue (an oropharyngeal tumor). Stage IV of this type of cancer is considered an advanced stage of the disease. This test result was given to Klais and he was informed that he had a twenty-five percent chance of living five additional years.

LaVertu then referred Klais to Dr. Adelstein of the Cleveland Clinic's Oncology Department. Klais's first meeting with Adelstein was on June 4, 1990. During this meeting, Adelstein explained to Klais and his wife that there was a Phase III clinical trial at the Cleveland Clinic studying the treatment of squamous cell head and neck cancer using experimental preoperative chemotherapy in addition to the standard treatment of radiation and surgery.[1] Research subjects within the clinical study were to be randomly assigned between two subject groups. The "Arm A" subjects were to receive only radiation therapy and surgery, the customary, standard treatment; no chemotherapy. The "Arm B" subjects were to receive preoperative chemotherapy coupled with radiation and surgery. Regardless of which Arm a subject was assigned, that subject was informed as to what treatment protocol they were to receive within the trial. Thus, it was not a blind study and it did not utilize placebos. Adelstein informed the couple that the patient was an ideal candidate to be included in the clinical study and sought the patient's consent to include him as a research subject. Adelstein, in addition to informing the patient of procedures, alternative therapies, and the risks and benefits of the clinical trial, informed the patient that he had two options. First, the patient could elect not to participate in the clinical trial and be treated with the standard treatment protocol of radiation and surgery or, second, the patient could elect to join the clinical trial where at least he had a fifty percent chance of receiving chemotherapy. Adelstein considered the effects of chemotherapy, at that point in time, to be speculative. Klais and

---

1. The Phase III clinical trial was designed to study the effect of two chemotherapy drugs (cisplatin and 5–Fluorouracil) coupled with radiation and surgery against the effect of radiation therapy and surgery alone in the treatment of squamous cell head and neck cancer. Along with Adelstein, LaVertu and Jarrold Saxton (a radiation oncologist) were also investigators in the Phase III clinical trial.

his wife also met with Oncology Nurse Marjorie Larto, R.N., Adelstein's oncology research nurse, who further discussed the clinical trial and exchanged information and answers with the couple. While testifying about the treatment he received, Klais stated the following in response to questioning:

"Mr. Cunningham: Now, Dan, before you began your cancer treatment in 1990 did anyone at The Cleveland Clinic inform you about any studies that had already been done evaluating the effects of radiation and chemotherapy on persons having head and neck squamous cell cancer, like you were diagnosed with?

"MR. BONEZZI: Objection.

"THE WITNESS: No.

"MR. CUNNINGHAM: Now, before you began your cancer treatment in 1990 did anyone at The Cleveland Clinic inform you that prior evaluation studies indicated that your chance of survival were better by being treated with radiation and chemotherapy than just radiation alone?

"MR. BONEZZI: Objection.

"THE WITNESS: No.

"MR. CUNNINGHAM: Dan, before you began your cancer treatment in 1990 did anyone at The Cleveland Clinic inform you that you had a right to be treated with radiation and chemotherapy?

"THE WITNESS: No.

"MR. CUNNINGHAM: And before you began your treatment for cancer—— cancer treatment in 1990 did anyone at The Cleveland Clinic give you the names of all or any hospital and/or cancer center which were at that time treating persons having head and neck squamous cell cancer, like you had, with radiation and chemotherapy?

"MR. BONEZZI: Objection.

"THE WITNESS: No.

"MR. CUNNINGHAM: Before you began, Dan, your cancer treatment in 1990 if any of your attending physicians at The Cleveland Clinic had suggested to you that your personal chances of survival were better with treatment of radiation and chemotherapy rather than radiation alone and if you were then asked which therapy you wanted, radiation and chemotherapy or radiation alone, how would you have responded?

"MR. BONEZZI: Objection.

"THE WITNESS: The last of the combination of the two, going for a cure.

"MR. CUNNINGHAM: Why was that——why would you have wanted both?

"THE WITNESS: It was the most opportune, opportunity for a cure.

"MR. CUNNINGHAM: Okay. Now, during this five-year period from about May of 1990 to about sometime in July of 1995, when you were treated and observed at The Cleveland Clinic did anyone at The Cleveland Clinic during that period ever suggest to you that you should opt out of this study and be treated with chemotherapy?

"MR. BONEZZI: Objection.

"THE WITNESS: No.

"MR. CUNNINGHAM: If at any time before July or August of 1995 if any of your attending physicians at The Cleveland Clinic had suggested to you that your personal chances of survival were better with additional treatment of chemotherapy would you have elected to do this?

"MR. BONEZZI: Objection.

"THE WITNESS: Yes.

"MR. CUNNINGHAM: And why would you, Dan?

"THE WITNESS: Because again we were going for a cure."

Klais was given a five-page informed consent form and some other cancer treatment related literature to review at the end of this meeting. In part, this consent form provided that Klais could discontinue participation within the trial "at any time without fears (*sic*) of penalty or loss of medical care." The patient, who was forty-five years old at the time, executed the consent form and enrolled in the Phase III clinical trial on June 7, 1990.

As a subject in the clinical trial, Klais was assigned to Arm A; he would receive no chemotherapy. Klais's participation in the clinical trial occurred during the Summer and Fall 1990. Over a period of fifty-nine days, Klais received radiation therapy by Dr. Jarrold Saxton. Surgery to Klais's neck also was performed to remove cancerous lymph nodes.

On August 1, 1990, with his radiation treatments having been concluded, Klais was examined by Adelstein. The examination indicated that the radiation had eradicated the cancer at the primary tumor site and two enlarged lymph nodes. At that examination, Adelstein discouraged the patient from pursuing chemotherapy. Thereafter, Klais was examined periodically at the Cleveland Clinic to monitor his condition and to determine if the cancer had returned.

On July 28, 1995, Klais was considered by his treating physicians to be cured of cancer because his cancer had apparently not returned for a five-year period since its diagnosis.

On January 2, 1996, Klais, at the request of Adelstein, met with Adelstein at the Cleveland Clinic. Adelstein informed Klais that his x-ray taken on July 28, 1995, indicated that the cancer had metastasized to the lungs and that the condition was terminal, giving the patient between two to twelve months of life expectancy.

On July 8, 1996, Klais and his wife, Linda, filed suit against the Cleveland Clinic and Weinstein, LaVertu, Adelstein and Saxton, concisely alleging in a two-paragraph pleading, medical negligence in misdiagnosing and mistreating Klais.

On November 4, 1996, plaintiffs filed an amended complaint. This amended complaint restated Klais's original claim for medical malpractice and, in addition, added a loss of consortium claim in favor of new party-plaintiff Linda.

Klais died on March 22, 1997, approximately seven years after the original diagnosis and six-and-one-half years following his radiation/surgery treatments in the clinical trial. The cause of death was the metastasized cancer. Thereafter, plaintiffs substituted Jean Stewart, Executor for the estate of Klais, as a party-plaintiff via a supplemental complaint filed on April 28, 1997. This supplemental complaint alleged three counts: (1) it restated the original medical malpractice claim in count one, (2) it added a claim for wrongful death due to the negligence of the defendants in count two, and, (3) it restated the loss of consortium claim in count three.

On August 31 and September 2, 1998, the defendants filed motions for summary judgment. The defendants' joint motion for summary judgment was supported by unauthenticated copies of the following: (1) excerpts from the August 16, 1996, plaintiffs' deposition of Mr. Klais, (2) a photocopy of a letter, dated August 25, 1998, from Charles McCarthy, Ph.D. to defense counsel in which the author opines that, based on the limited materials he reviewed, the Phase III clinical trial complied with federal regulations and the informed consent was in compliance with Federal Food and Drug Administration ("FDA") and Federal Department of Health and Human Services ("HHS") regulations, (3) copies of assorted case law, (4) a photocopy of the Clinic's subject authorization for investigational studies relative to the Phase III clinical trial, signed by Klais on June 7, 1990, and a photocopy of the five-page consent form signed by Klais that same date, (5) excerpts from the May 5, 1997 plaintiffs' deposition of Adelstein, (6) photocopies of two pages from the medical record of Klais, dated June 4 and June 7, 1990, (7) excerpts from the May 12, 1998 plaintiffs' deposition of Nurse Larto, and, (8) a copy of 45 C.F.R. 46.116, which details HHS's general require-ments for informed consent. The motions for summary judgment by the individual physicians each were supported by that physician's affidavit.

Except in the case of Weinstein, the plaintiffs filed briefs in opposition to the joint and individual motions for summary judgment. The brief in opposition to

the joint motion for summary judgment was supported by voluminous documentary evidence. A copy of the Phase III clinical trial's 1990 project application was included. Also included was the affidavit of Thomas Houlihan, which authenticates the copy of the National Cancer Institute's "clinical trial information for physicians."

The plaintiffs' brief contained a copy of a June 1998 report by Arthur Zahalsky on the combined effects of chemotherapy and radiation on cancer cells using 5–Fluorouracil, cisplatin and radiation that formed Zahalsky's expert opinion that significant medical literature on the use of combination chemotherapy in the treatment of advanced head and neck cancer was available and known when Klais presented himself for cancer treatment at the Clinic. Zahalsky believed that Klais did not receive sufficient information regarding the "statistical stratification process of the trial * * *, the randomization procedure, nor of alternative centers where he could go to receive combination chemotherapy, as desired by him," so that his informed consent was lacking. Zahalsky's Report also stated that the participants of the Phase III trial who received radiation and chemotherapy had "statistically significant fewer distant metastases as compared to patients" receiving only radiation in the trial. Finally, according to his Report, Zahalsky believed that Klais probably died sooner than he should have had he been enrolled in the radiation/chemotherapy arm of the clinical trial.

The plaintiffs' brief also contained an expert report prepared by Oncologist Malin Dollinger, M.D., in which the expert states that:

"His physicians did not disclose, verbally or as part of the written information and consent form, that a prior phase II study, at the same institution [the Cleveland Clinic], of similar treatment had shown very favorable differences and benefits if chemotherapy were added to radiation therapy (expected three-year event-free survival 70–80% vs 50%). They were ethically required to make such disclosure. Thus, these physicians violated their informed consent obligations to their patient. In addition, they did not discuss with him the option of receiving such combined treatment 'off study.' It has been stated that such 'off study' treatment was not available at the Cleveland Clinic. However substantially similar treatment was available elsewhere, at other cancer treatment centers as well as in private oncology facilities. He was not made aware of such availability. * * * Thus, his physicians were required to function as 'patient advocates' and inform him of the treatment options and possibilities that were available to patient, other than the phase III investigational protocol in which we [sic] was eventually enrolled. The affidavit of Jay Katz, M.D., also discusses this issue, and this reviewer agrees with such discussion and opinion. If such combined treatment had been given patient in 1990, it is medically probable that he would be cured or disease-free today.

"* * *

"Based upon a reasonable medical certainty, it is my opinion that had Daniel V. Klais been treated with chemotherapy plus radiotherapy, he would have lived, disease free for several more years; and further, he would have had a substantial chance of living out his normal life expectancy, disease free, to the approximate year of 2022." (Explanation added.)

The brief in opposition also included a copy of the 1998 medical expert report by Oncologist Laurens White, M.D. White states that:

"It is my conclusion that Dr. Adelstein and the Cleveland Clinic erred in two regards. They failed to truly inform Mr. Klais of the available treatment, and instead, insisted that the only way he could receive chemotherapy plus radiation was as part of an experimental study. It is clear that in 1990 there was a great deal of evidence, some of it conflicting, but most of which showed that combining chemotherapy with radiation produced a definite benefit in terms of long-term survival in patients with head and neck cancer, particularly cancer of the base of the tongue. * * * Accordingly, I support Dr. Katz' notion that this was not an informed decision. They told him he had no choice and, in fact, he did. Secondly, by denying him that choice, they denied him the real benefit of a combination of radiotherapy with chemotherapy, and in that regard, it seems to me that they fell below the standard of care, both in terms of informed consent and in terms of allowing him this choice. * * * It is to minimize that chance of pulmonary metastases that chemotherapy is given, and I believe that it would have improved his survival. * * *."

Also included in the brief were copies of published medical reports from 1986 and 1990 by Adelstein regarding chemoradiotherapy in the treatment of squamous cell carcinoma of the head and neck which detail success in such treatment.[2] And the plaintiffs included: (1) the affidavit of Linda Klais in which she avers that she and her husband were never told of any benefit to chemotherapy in the treatment of Klais's cancer in 1990, and that Klais preferred to receive chemotherapy in addition to radiation because he was seeking whatever treatment that would provide the best chance for a recovery, (2) a copy of Adelstein's 1996 final report on the Phase III clinical trial in which Mr. Klais was a participant,[3] (3) the

---

**2.** In particular, the 1986 Cancer Treatment Reports publication, at page 766, stated the following in light of the very favorable preliminary response rates given the combined treatment: "This chemotherapy combination [cisplatin and 5–Fluorouracil] in conjunction with radiation would thus seem the ideal choice for the initial treatment of this disease." [Explanation added.]

**3.** The Report's Conclusion, at page 3, was:

expert report of bioethicist Mary Waithe, Ph.D., in which she opines that the Clinic and Drs. LaVertu, Adelstein and Saxton failed to obtain valid informed consent to Klais' participation in the Phase III clinical trial, (4) the expert report of F. William Dommel, Jr., B.A., J.D., in which he states that based on his thirty-year career at the Federal National Institutes for Health, and as a drafter of 45 C.F.R. 46, that the written consent for the Phase III clinical trial by Klais was not proper under federal regulations for a variety of reasons including the failure to provide information as to where alternate treatment could be obtained, (5) the expert report of Jay Katz, M.D., in which he states that informed consent to Klais's participation in the Phase III clinical trial was lacking in the failure to disclose pertinent information in the consent process, the failure to inform the patient of the availability of alternative treatment at other medical centers, and the failure to disclose in the consent process alternative treatments that may have been advantageous to the patient, the benefits and risks of such alternative treatments, and the defendants' opinions and conclusions relative to this alternative treatment during the consent process, (6) an expert report by John Burke, Ph.D., regarding the significant economic damages (loss of earning capacity and loss of enjoyment of life in the total amount of approximately $6,300,000) occasioned by the death of Klais.

On September 15, 1998, with leave of court, plaintiffs filed a second amended complaint. This pleading restated the previous three counts presented in the pleading filed on April 28, 1997, but added count four that alleged that the defendants failed and refused to "inform Decedent of the benefits of chemotherapy (combined with radiation), by failing and refusing to treat Daniel V. Klais with chemotherapy (combined with radiation), and by failing and refusing to inform him of where such treatment was then available." This pleading also added a prayer for punitive damages in the amount of $10,000,000.

On September 25, 1998, plaintiffs dismissed without prejudice defendant Weinstein.[4]

On October 8, 1998, the trial court conducted an oral hearing relative to the motions for summary judgment. On October 9, 1998, the trial court granted summary judgment to the remaining defendants without opinion or elucidation utilizing a half-sheet status form entry.

---

"Continuous course radiation therapy and concurrent combination chemotherapy is an intensive, toxic but tolerable treatment regimen which, when compared to radiation therapy alone, can produce an improvement in relapse-free survival, a decrease in distant metastases, and an improvement in overall survival with successful primary site preservation."

4. On October 5, 1998, and despite the dismissal of the party, the trial court granted Dr. Weinstein's motion for summary judgment.

The appeal *sub judice* presents three assignments of error. In order to preserve a more logical review, these assignments will be addressed in an order other than that given by appellants.

The second assignment of error provides:

"The trial court erred in failing to strike appellees' motions for summary judgment and the materials attached thereto."

In this assignment, appellants make two arguments. First, appellants argue that the motions for summary judgment should have been stricken as untimely because leave of court to file the motion was not obtained prior to the filing of the dispositive motions. Second, appellants argue that the trial court should have stricken the affidavits of Saxton and LaVertu that supported the motions for summary judgment because these two doctors, despite having presented deposition testimony in the case, were not identified as expert witnesses by the defense and the defense did not tender to plaintiffs written expert reports from these two doctors.

With regard to the first subargument, the record indicates the following relevant procedural history:

"1.  August 31 and September 2, 1998.  Defense files the motions for summary judgment;

"2.  September 8, 1998.  Plaintiffs file a motion to strike the motions for summary judgment as untimely, and to strike the evidentiary materials attached to the motions for summary judgment (NOTE: This motion to strike was never ruled on by the trial court);

"3.  September 9, 1998.  Defense files a motion for leave to file the previously filed motions for summary judgment (NOTE: This motion for leave to file was never ruled on by the trial court);

"4.  September 9, 1998.  Defense files a supplemental brief in support of summary judgment, and a brief in opposition to the motion to strike;

"5.  September 29, 1998.  Plaintiffs file briefs in opposition to the motions for summary judgment;

"6.  October 8, 1998.  Trial court conducts oral hearing on the remaining[5] motions for summary judgment.

"7.  October 9, 1998, Trial court grants the remaining motions for summary judgment.

---

5.  Dr. Weinstein had been voluntarily dismissed without prejudice by plaintiffs on September 25, 1998.

"8. October 15, 1998. (Trial in the case had been scheduled for this date by order dated March 11, 1998.)"

■ This court stated in *Pisani v. Pisani* (Sept. 24, 1998), Cuyahoga App. No. 74373, unreported, 1998 WL 655484, at 5, that:

"the control of the docket and consideration of motions by the trial court rests within the sound discretion of that court and in accordance with the rules of civil procedure. *Lucas v. Gee* (1995), 104 Ohio App.3d 423, 429, 662 N.E.2d 382; *Aydin Co. Exchange, Inc. v. Marting Realty* (1997), 118 Ohio App.3d 274, 692 N.E.2d 662."

■ An abuse of discretion connotes more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1141–1142.

■ Civ.R. 56(B) requires that leave of court be given to file a defense motion for summary judgment where a pretrial or trial date has been scheduled. While the defense did not obtain leave of court prior to filing its motions for summary judgment, we cannot conclude that the failure of the trial court to rule on the motion to strike was an abuse of discretion. This is so because the motions for summary judgment were filed far enough in advance of the scheduled trial date as to permit the plaintiffs to file opposition briefs to the motions in writing without causing a continuance of the scheduled trial date. Also, the subsequent actions of the trial court in considering and ruling on the motions for summary judgment impliedly granted the defense leave to file the motions for summary judgment. Putting the rulings on the motions for summary judgment aside, plaintiffs can point to no prejudice arising from the trial court failing to strike the dispositive motions as untimely under Civ.R. 56(B).

We now turn to the second subargument contained in this assignment.

■ This second subargument is premised on appellants' belief that the trial court should have stricken from the motions for summary judgment the supporting affidavits of Saxton and LaVertu [6] because: (1) this was "expert testimony," (2) the defense did not disclose to the plaintiffs that they intended to elicit expert testimony from these witnesses (see Civ.R. 26[E][1][b] ), and, (3) the defense

---

**6.** The half page affidavits of these two doctors were perfunctory, indicating in cursory averments the following: (1), the fact that they are licensed to practice medicine in Ohio and the area of their specialty; (2), the fact that they are employed by The Cleveland Clinic Foundation; (3), the fact that they rendered medical care to Mr. Klais and that they are named defendants in the present lawsuit stemming from that care; and, (4), the boilerplate statement that "Based on my experience and training, I fully complied with the standard of care in all aspects of my treatment of Daniel V. Klais, Deceased."

failed to provide expert reports summarizing the expected testimony of these two physicians prior to the filing of the dispositive motions. Appellants' reliance upon these rules of procedure is mistaken because the affidavits of these witnesses were used as part of motion practice, not trial. Both of these rules apply to expert witnesses who are expected to testify *at trial.*

The second assignment of error is overruled.

The third assignment of error provides the following:

"The trial court erred in denying appellants' motion to compel."

The motion to compel was originally filed by the plaintiffs on June 12, 1997, seeking certain files to be produced by Cleveland Clinic and Adelstein. These files included: all materials dealing with the Phase III Study in which Klais and approximately one hundred other patients were participants, the names and addresses of all people on the Clinic's Institutional Review Board who reviewed the results of that study, the names and addresses of the Clinic's Research Program Committee who authorized and/or reviewed the study, the files of patients who were participating in the Phase II Clinical Trial in which squamous cell head and neck cancer sufferers were being treated with hyper-fractionated radiation and chemotherapy protocol, and concurrent radiation and chemotherapy protocol, and the files of Adelstein relating to his involvement in a number of previous squamous cell head and neck cancer clinical trials whose results were reported in various professional journals. Defendants filed an opposition brief on July 2, 1997, claiming that the materials sought were either irrelevant, subject to a physician-patient privilege, or subject to a statutory privilege pursuant to R.C. 2305.25.

On May 19, 1998, plaintiffs filed a supplemental motion to compel. On May 26, 1998, the defense filed a response to this motion, complying in certain respects to plaintiffs' discovery, but failing to produce some of the requested material citing relevance and/or undue burden.

On September 11, 1998, the trial court issued an order granting in part and denying in part the supplemental motion to compel. Specifically, the court precluded discovery of the following: on privilege grounds, the minutes of all meetings of the Clinic's Institutional Review Board and Research Program Committee relating to the Phase III clinical trial; on privilege and confidentiality grounds, the names, addresses and copies of consent forms for the 100 participants of the Phase III clinical trial; on privilege and relevancy grounds, the files relating to the Phase II clinical trial; on apparent relevancy grounds, a list of the names and positions of oncologists and radiation oncologists at the Clinic between 1988 and 1998 who had no contact with Klais; on relevancy grounds, copies of all patient consent forms used in every clinical trial in which Adelstein was the

investigator or co-investigator. By separate order made on September 14, 1998 and journalized on September 15, 1998, the defense was ordered to provide the permitted discovery by September 18, 1998.

On September 23, 1998, plaintiffs filed a motion to reconsider relative to the ruling on the motion to compel. The defense filed a brief in opposition to reconsideration on October 1, 1998. Reconsideration was denied on October 5, 1998, three days prior to the trial court's oral hearing on the defendants' motions for summary judgment.

Appellants argue on appeal that the defense never produced the materials that were the subject of the motion to compel ruling and that this material, in addition to the material which was held to be non-discoverable, was crucial to their ability to properly respond to the then pending motions for summary judgment.

This argument is governed by the application of Civ.R. 56(F), which provides:

"(F) When affidavits unavailable

"Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just."

The following was stated in *Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 523 N.E.2d 902, paragraph four of the syllabus:

"Civ.R. 56(F) authorizes a trial court to delay decision on a summary judgment motion while the non-moving party gathers necessary rebuttal data. However, an appellant who failed to seek relief under Civ.R. 56(F) in the trial court has not preserved his rights thereto for purposes of appeal."

The trial court record below indicates no motion for continuance with supporting affidavit pursuant to Civ.R. 56(F) by plaintiffs. The failure to move for a Civ.R. 56(F) continuance prior to the summary judgment rulings waives any error in the defense not providing the discovery materials sought by plaintiffs. *Id.*

The third assignment of error is overruled.

The first assignment of error provides:

"The trial court erred in granting summary judgment to appellees."

The standard of review relative to a ruling on a motion for summary judgment was provided by this court in *Freeman v. Cleveland Clinic Foundation* (1998), 127 Ohio App.3d 378, 383–384, 713 N.E.2d 33, 36–37:

"The standard for granting a motion for summary judgment is set forth under Civ.R. 56(C). In applying this rule, the Ohio Supreme Court has consistently held that, before such a motion can be granted, the moving party must demonstrate that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 667 N.E.2d 1197; *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 617 N.E.2d 1129.

"A motion for summary judgment forces the nonmoving party to produce evidence on issues for which that party bears the burden of productions at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, syllabus. The nonmovant must also present specific facts and may not rely merely upon the pleadings or upon unsupported allegations. *Shaw v. J. Pollock & Co.* (1992), 82 Ohio App.3d 656, 612 N.E.2d 1295. When a party moves for summary [127 Ohio App.3d at 384–385, 713 N.E.2d at 37] judgment supported by evidentiary material of the type and character set forth in Civ.R. 56(E), the opposing party has a duty to submit affidavits or other material permitted by Civ.R. 56(C) to show that there is a genuine issue for trial. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

"In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, the Ohio Supreme Court recently discussed the proper standard to be applied when reviewing summary judgment motions. The court stated as follows:

"'Again, we note that there is no requirement in Civ.R. 56 that any party submit affidavits to support a motion for summary judgment. See, e.g., Civ.R. 56(A) and (B). There is a requirement, however, that a moving party, in support of a summary judgment motion, specifically point to something in the record that comports with the evidentiary materials set forth in Civ.R. 56(C).'

"This court's analysis of an appeal from a summary judgment is conducted under a de novo standard of review. See *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765, 767–768; *Howard v. Wills* (1991), 77 Ohio App.3d 133, 601 N.E.2d 515. No deference is given to the decision under review, and this court applies the same test as the trial court. *Bank One of Portsmouth v. Weber* (Aug. 7, 1991), Scioto App. No. 1920, unreported, 1991 WL 156416."

The tort of lack of informed consent in a medical context was discussed in *Klein v. Biscup* (1996), 109 Ohio App.3d 855, 863, 673 N.E.2d 225, 230–231:

"The Supreme Court of Ohio established the tort of informed consent in *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, and defined the elements in the syllabus:

" 'The tort of lack of informed consent is established when:

" '(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

" '(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

" '(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.' "

In the case *sub judice,* given the competing expert testimony and documentary evidence provided in the record on appeal, we conclude that there exists genuine issues of material fact on whether Klais gave informed consent to be a participant in the Phase III clinical trial and receive the treatment he was afforded by the Clinic and LaVertu, Adelstein, and Saxton. Accordingly, the trial court erred in granting summary judgment for these four defendants.

With regard to the trial court granting summary judgment in favor of Weinstein, we conclude that this order is a nullity and void and must be reversed and vacated. At the time the trial court made this summary judgment order, Weinstein was no longer a party to the action, having been voluntarily dismissed by plaintiffs approximately two weeks prior to the court's rulings on the summary judgment motions.

The first assignment of error is affirmed.

*Judgment affirmed in part*
*reversed in part*
*and cause remanded.*

PORTER, A.J., and DYKE, J., concur.