OPINION.
{¶ 1} The death of one's child is an unimaginable tragedy. It is so unnatural, so random. In reviewing this appeal, we discharge our duty without passion or prejudice, recognizing that this case had its beginnings in the suffering of a little boy and his family.
 {¶ 2} In this appeal, plaintiffs-appellants Clayton and Nancy Werden challenge the trial court's grant of summary judgment to defendants-appellees Drs. Claire Mazewski and Theodore Zwerdling and its partial grant of summary judgment to defendant-appellee Children's Hospital Medical Center ("CHMC"). They also challenge the judgment of the trial court entered on a jury's verdict in favor of defendants-appellees Dr. Cyndi DeLaat and CHMC.
 Aplastic Anemia {¶ 3} The Werdens filed this medical malpractice action against CHMC and the individual doctors after the death of their minor son, Clayton Werden IV ("Clayton"), from complications resulting from aplastic anemia.
 {¶ 4} In early September of 1996, the Werdens took six-year-old Clayton to CHMC after noticing unexplained bruising on his body. Upon Clayton's admission to CHMC, Dr. DeLaat was assigned as his attending physician. Clayton would be assigned a different attending physician each month of his illness, including Drs. Mazewski and Zwerdling, but Dr. DeLaat retained the overall supervisory role for Clayton's care.
 {¶ 5} On September 12, 1996, Clayton was diagnosed with aplastic anemia. Aplastic anemia occurs when a person's bone marrow fails to produce sufficient blood cells and platelets. A patient's blood counts are used to determine the severity of the aplastic anemia. One such blood count is the absolute neutrophil count, or ANC. A patient's ANC measures the number of cells that are capable of fighting off a bacterial infection. Due to Clayton's low ANC, he suffered from severe aplastic anemia.
 {¶ 6} A patient suffering from aplastic anemia has various treatment options. The preferred method of treatment is a bone-marrow transplant from a matched sibling. An HLA blood test, which determines whether any immediate family member is a matched donor, was conducted on Clayton's parents and siblings on September 13, 1996. On September 18, 1996, Dr. DeLaat knew that none of Clayton's immediate family members was a matched donor.
 {¶ 7} The Werdens next decided to test their extended family for a possible match. They were unable to find a matched donor. On October 5, 1996, the Werdens authorized the initiation of immunosuppressive therapy to treat Clayton. Immunosuppressive therapy, in succinct layman's terms, destroys the patient's immune cells in an effort to allow any remaining bone-marrow stem cells to regrow.
 {¶ 8} Clayton did not respond to the immunosuppressive therapy, and he passed away on January 26, 1997.
 {¶ 9} The Werdens' medical malpractice claim focused on the timing of theimmunosuppressive therapy. The Werdens alleged that they were not adequately informed that the likelihood of finding a matched donor in their extended family was far more remote that finding one in their immediate family. They alleged that CHMC and Clayton's attending physicians should have explained this difference and initiated immunosuppressive therapy as soon as it was determined that no immediate family member was a matched donor.
 {¶ 10} But the appellees alleged that immunosuppressive therapy could nothave been initiated until it was determined that Clayton was not suffering from Fanconi's anemia, a genetic form of anemia. According to the appellees, while immunosuppressive therapy may have benefited a patient suffering from aplastic anemia, it would have harmed a patient suffering from Fanconi's anemia. Fanconi's anemia is either diagnosed or eliminated through a diexpoxybutane, or "DEB," test. The appellees argued that they could not have begun therapy until the DEB test had ruled out Fanconi's anemia on September 25, 1996. They further argued that the timing of the immunosuppressive therapy did not affect the quality of Clayton's care.
 {¶ 11} The trial court granted summary judgment in favor of Drs. Mazewskiand Zwerdling shortly before trial. After a jury trial, a verdict was returned in favor of CHMC and Dr. DeLaat. The Werdens have appealed, raising sixteen assignments of error, which we address out of order.
 Trial Before a Visiting Judge {¶ 12} The assigned judge referred this case to a visiting judge for trial. The visiting judge was a retired judge of the common pleas court.
 {¶ 13} In their first and sixteenth assignments of error, the Werdens argue that a visiting judge should not have presided over the trial. In their first assignment of error, the Werdens contend that the visiting-judge system deprived them of due process because the transfer of their "complex multi-week medical malpractice death case" did not occur until the day of trial.[1] In their sixteenth assignment of error, the Werdens contend that the visiting judge was without authority to hear the matter. Because the assignments overlap, we discuss them together.
 A. Waiver {¶ 14} First, we note that the record reveals no objection by the Werdens to the transfer of their case to a visiting judge. None of the issues raised on appeal with respect to the visiting judge was raised in the court below.
 {¶ 15} It is axiomatic that a party waives the right to raise on appeal any error that the party failed to bring to the trial court's attention at a time when the court could have corrected or avoided the error.[2] For example, if a party fails to assert in a timely manner the impropriety of any procedural irregularities associated with the transfer of a case, the party waives the issue for appeal.[3] So any party objecting to the reassignment or transfer of a case must raise the objection at the earliest opportunity.[4] "If the party has knowledge of the transfer with sufficient time to object before the new judge takes any action, that party waives any objection to the transfer by failing to raise that issue on the record before the action is taken."[5]
 {¶ 16} Because the Werdens failed to object to the case being transferred to a visiting judge, they have waived their right on appeal to contest any error related to the transfer.
 {¶ 17} While the Rules of Criminal Procedure provide for the notice of plain errors not brought to the court's attention, the Rules of Civil Procedure contain no similar provision.[6]
So, "[i]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process."[7]
 {¶ 18} Keeping these principles in mind, we turn to the Werdens' argumentsunder both the first and the sixteenth assignments of error.
 B. Trial Before An Elected Common Pleas Judge {¶ 19} The Werdens argue that the appointment of a retired judge to preside over the trial in this case violated Section6(A)(3), Article IV of the Ohio Constitution, which requires a common pleas court judge to have been elected and to be in the current service of the judge's term.
 {¶ 20} The Ohio Supreme Court has rejected such an argument, noting that Section 6(A)(3), Article IV of the Ohio Constitution must be read together with Section 6(C), Article IV, which provides for the chief justice's assignment of retired judges to active duty as judges.[8] The court held that Section 6(A)(3) does not require that a retired judge appointed under Section 6(C) be elected and currently serving his term.[9]
 {¶ 21} In this case, the assignment of a retired judge to preside over the trial did not violate the Werdens' rights under the Ohio Constitution.
 C. No Violation of Local Rule {¶ 22} The Werdens also assert that the assignment of a visiting judge violated Loc.R. 7(C) of the Hamilton County Common Pleas Court. The rule provides that, on a scheduled trial date, if an assigned judge is absent or otherwise engaged, the administrative judge may assign a case to "any judge of that division."
 {¶ 23} The Werdens do not allege how the rule was violated. Regardless, this court has held that the purpose of Loc.R. 7(C) is to eliminate judge-shopping and in no way prohibits the transfer of a case from an assigned judge.[10] Accordingly, the transfer of this case to a visiting judge did not violate the local rules of the common pleas court.
 D. No Last-Minute Transfer Occurred {¶ 24} Moreover, we find the Werdens' argument with respect to the "last minute" transfer of the case to a visiting judge to be somewhat disingenuous. The record reflects that the Werdens had known for months that their case would be tried before a visiting judge. In March 2004, two months before trial, the Werdens filed a motion to limit the number of defense experts. In the motion, the Werdens wrote, "When the parties last went to court[,] they were informed that this case is set for jury trial on May 3, 2004[,] and to be tried before a visiting judge." So any suggestion by the Werdens that they were caught off guard by the transfer to a visiting judge is undermined by their own words in a motion filed well before the trial date.
 E. No "Evidence of Transmission of Jurisdiction" Required {¶ 25} The Werdens also point out that the record does not contain "any evidence of transmission of jurisdiction." But, as this court has stated, "We know of no rule, * * * nor have the [appellants] cited us to any, which requires * * * [a] valid letter of assignment from the Chief Justice to be entered by the local court in order to become effective."[11]
 F. No Prejudice From Prior Hearing on Pretrial Motions {¶ 26} The Werdens further challenge the transfer of the case to a visiting judge who was unfamiliar with pretrial motions that had been decided by the assigned judge. Specifically, the Werdens argue that the visiting judge had no opportunity to hear arguments on their motion to limit the number of defense experts, or to read depositions that had been filed by the parties in connection with the summary-judgment motions.
 {¶ 27} In their motion to limit defense experts, the Werdens relied on the costliness of conducting multiple discovery depositions and the cumulative nature of the experts' testimony. In response, the defense indicated that their expert witnesses' testimony would not be redundant. Following arguments, the assigned judge denied the motion.
 {¶ 28} We see no prejudice resulting from the assigned judge's hearing of the motion to limit the number of defense witnesses. The visiting judge would have derived no benefit from arguments about the high cost of the experts' depositions, because the depositions had already occurred. Moreover, the pretrial ruling by the assigned judge did not prevent the Werdens from raising the issue of cumulative testimony at trial.
 {¶ 29} The Werdens also argue that the visiting judge "had no opportunity to read the depositions that were the basis of the 11th hour summary judgment. He felt `bound by [the assigned judge's] summary judgment rulings.'" The Werdens do not direct us to, nor can we find, any place in the record reflecting this error. Moreover, even if we assume that the visiting judge had not read the deposition transcripts, the Werdens do not argue how they were prejudiced as a result.
 {¶ 30} In sum, because the Werdens failed to object at any point in the proceedings to the case's transfer to a visiting judge, they waived their right to contest on appeal any error connected with the transfer. Moreover, after reviewing the record, we find no error, plain or otherwise, resulting from the transfer.[12] We overrule the first and sixteenth assignments of error.
 Summary Judgment {¶ 31} In their second assignment of error, the Werdens argue that the trial court erred by entertaining, and then granting, the appellees' motions for summary judgment on the eve of trial.
 A. Leave to File Was Implicit {¶ 32} The Werdens first point to Civ.R. 56(B), which requires a defending party to obtain leave of court before filing a motion for summary judgment once an action has been set for pretrial or trial. But this court has held that "a court may, in its sound discretion, consider a motion for summary judgment that has been filed, without express leave of the court, after the action has been set for trial."[13] By entertaining a motion for summary judgment in such a situation, a court has implicitly granted leave to file the motion.[14]
 {¶ 33} In this case, where the moving parties had not first requested leave to file summary-judgment motions, the trial court implicitly granted them leave to do so when it considered the motions. In this, we find no abuse of discretion. And because the Werdens raised no objection to the untimely summary-judgment filings, by motion to strike or otherwise, they waived their right to contest on appeal any error committed by the trial court in considering the motions.[15]
 B. Our Standard of Review {¶ 34} We review a grant of summary judgment de novo.[16] Summary judgment should be granted only if (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can only come to a conclusion adverse to the nonmoving party, when viewing the evidence in favor of the nonmoving party.[17]
 {¶ 35} "[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims."[18] Once the moving party satisfies its initial burden, the nonmoving party must then produce competent evidence showing the existence of a genuine issue for trial.[19]
 C. Summary Judgment in Favor of Doctors {¶ 36} In Bruni v. Tatsumi,[20] the Ohio Supreme Court set forth the following requirements for proving a medical malpractice claim:
 {¶ 37} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."[21]
 {¶ 38} The supreme court explained, "Proof of malpractice, in effect, requires two evidentiary steps: evidence as to the recognized standard of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff."[22] In general, the plaintiff must demonstrate a breach of the applicable standard of care and proximate causation through expert testimony.[23]
 {¶ 39} The Werdens contend that summary judgment was erroneously entered in favor of Drs. Mazewski and Zwerdling, but they offer no argument in support of this contention. The record demonstrates that Drs. Mazewski and Zwerdling met their initial burden under Civ.R. 56 by demonstrating that no issue of material fact remained concerning their conformance with the prevailing standard of care. The doctors identified testimony by the Werdens' sole expert witness on the issue, Michael E. Trigg, M.D., who acknowledged that he had no criticism of either doctor with respect to the care and treatment they rendered. Because the Werdens failed to come forward with competent evidence demonstrating a genuine issue of fact for trial on their malpractice claims against Drs. Mazewski and Zwerdling, the trial court properly granted summary judgment in the doctors' favor.
 D. Summary Judgment In Favor of CHMC {¶ 40} By its entry of partial summary judgment, the trial court dismissed all claims against CHMC except for its respondeat-superior liability as it related to Dr. DeLaat. So we must consider the Werdens' claims of vicarious liability against CHMC for the acts of its employees Drs. Zwerdling and Mazewski.
 {¶ 41} Under the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees.[24] But there can be no vicarious liability imposed upon the hospital as a principal, if there is no liability on the part of its employee. In other words, "a direct claim against a hospital premised upon the negligence of an employee who cannot be found liable is contrary to basic agency law."[25]
 {¶ 42} Because no liability could be attributed to Drs. Mazewski and Zwerdling, there could be no vicarious liability imposed upon the hospital as their employer. Accordingly, the trial court properly entered summary judgment in favor of CHMC on the Werdens' indirect-liability claims against the hospital (except, as the trial court held, for the hospital's respondeat-superior liability for Dr. DeLaat).
 {¶ 43} The Werdens argue, though, that the trial court erred by entering judgment for CHMC because they had presented sufficient evidence on their claim of direct liability against the hospital, their so-called "corporate negligence" theory. According to the Werdens, their "corporate theory of negligence [addressed] the hospital's mechanical assignment of physicians to patients."
 {¶ 44} The parties agree that the case management system employed by CHMC resulted in different physicians being responsible for Clayton's care based on arbitrary assignment by calendar date. We acknowledge that this system could create a situation in which patient care might be compromised due to insufficient communication at the time of transfer of care responsibility or some other set of circumstances tantamount to a "fall between the cracks."
 {¶ 45} But we point out that the Ohio Supreme Court has specifically refused to endorse such expansive liability for a hospital:
 {¶ 46} "We are aware that a number of our sister jurisdictions have expanded the independent duty of hospitals so as to require them to totally ensure the patient's safety while at the hospital. This expansion of a hospital's duties, including a duty to oversee a physician's care of individual patients and a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patient, has progressed in varying degrees, under the moniker of `corporate negligence,' towards imposing strict liability on hospitals. We are not convinced of the wisdom of such expansive liability * * *."[26]
 {¶ 47} Moreover, the Werden's complaint had alleged no such cause of action for corporate negligence against CHMC. Nor had they requested leave to amend their complaint to add such a claim. The first time the Werdens raised the theory of corporate negligence was in their response to CHMC's motion for summary judgment, shortly before trial. Consequently, we find no error in the trial court's entry of partial summary judgment in favor of CHMC. We overrule the second assignment of error.
 Misconduct of Defense Counsel {¶ 48} In their ninth assignment of error, the Werdens allege that the trial court erred by permitting the misconduct of defense counsel during opening statements, throughout the trial, and during closing argument.
 A. Opening Statements {¶ 49} During opening statements, defense counsel attempted to bolster the credibility of CHMC by stating, "The evidence will show that Cincinnati Children's Hospital Medical Center is a tribute to this community starting back when * * * Dr. Sabin was able to assist in the eradification of polio worldwide * * * the evidence will show, in 1960 that [the] original polio vaccine that was discovered right here in Cincinnati in our town up at Children's Hospital Medical Center was given to hundreds of thousands of kids throughout the United States. It's quite an amazing place and has an amazing number of qualified physicians just like Dr. DeLaat."
 {¶ 50} Counsel is afforded wide latitude during opening statements, but may not attempt to sway or influence the jurors by discussing collateral issues that will not be proved by the evidence presented.[27] Improper and patently harmful statements by counsel may warrant a mistrial or reversal.[28]
 {¶ 51} These statements by defense counsel were improper. Comments regarding the history of CHMC and the polio vaccine were extraneous to the parties' dispute and were not supported by evidence adduced at trial. But we cannot conclude, in light of the remainder of the opening statement and the entire trial, that these comments were so harmful as to sway the jury.
 B. Misconduct During Trial {¶ 52} The Werdens allege that, during trial, defense counsel attempted to engender the jury's sympathy for Dr. DeLaat by asking her if she had any regrets about her career choice as a result of the lengthy trial.
 {¶ 53} The Werdens further refer us to two instances in which defense counsel allegedly repeated objectionable testimony to the jury after objections to the testimony had been sustained. And they additionally contend that defense counsel was consistently rude and discourteous to Dr. Trigg throughout his testimony.
 {¶ 54} We find no prejudicial error in these comments cited by the Werdens. The trial court sustained the Werdens' objection concerning Dr. DeLaat. "Error cannot be predicated on objections that have been sustained by the trial court."[29]
 {¶ 55} And we find the Werdens' allegation that defense counsel repeated testimony after objections to the testimony had been sustained to be a slight mischaracterization. In the first instance cited by the Werdens, the witness independently answered a question to which the trial court had sustained an objection. This was not error, as the witness' answer was not encouraged by defense counsel. In the second instance, defense counsel repeated a witness' answer that the trial court had instructed the jury to disregard. This was improper. But because the trial court struck the testimony, no error resulted.[30]
 {¶ 56} We further find no merit in the Werdens' argument that defense counsel was repeatedly discourteous to Dr. Trigg. Our review of the record indicates that both defense counsel and Dr. Trigg were slightly contentious at times. But a few heated comments, taken in the context of a lengthy examination, cannot be shown to have prejudiced the Werdens.
 C. Closing Argument {¶ 57} The Werdens allege that several instances of misconduct occurred during closing argument. As in opening statements, counsel is afforded wide latitude during closing argument.[31] But counsel must refrain from making arguments not supported by the evidence and must avoid inappropriate and offensive remarks concerning opposing counsel and witnesses.[32] "When argument spills into disparagement not based on any evidence, it is improper."[33] And when the misconduct of defense counsel undermines the fair and impartial administration of justice, a new trial is warranted.[34]
 {¶ 58} During closing argument, defense counsel criticized Dr. Trigg by stating that "Dr. Trigg is the king of half truths" and that "Dr. Trigg stands alone along his peers and something really smells." Defense counsel additionally stated, "And when you want to talk about people who're willing to shape their testimony because they are being paid, lets look at Dr. Trigg." The Werdens failed to object to any of these statements.
 {¶ 59} Because no objections were raised, we review for plain error.[35] These comments regarding Dr. Trigg's testimony were inappropriate. Counsel should refrain from using offensive comments to describe opposing witnesses. We have no doubt that defense counsel intended to convey that no other testifying experts agreed with Dr. Trigg. But this could have been accomplished without analogizing Dr. Trigg to the "cheese" in the child's poem "The Farmer and the Dell." However, despite the inappropriateness of these comments, they certainly do not rise to the level of plain error.
 {¶ 60} Defense counsel additionally commented on the fact that the Werdens had consulted with various doctors who did not testify at trial. Specifically, counsel stated, "And we know that Mr. Werden went out and talked to all these other doctors. We know about Dr. Rappeport. We know he talked to Dr. Commita and Margolis up in Wisconsin. Where are they? He talked to fifteen doctors or so before the stem cell factor was given. None of those doctors are here."
 {¶ 61} These comments improperly invited the jurors to speculate about the absence of testimony from the named doctors. But the trial court sustained the Werdens' objection to these statements. Under these circumstances, they are not grounds for error.[36]
 {¶ 62} Defense counsel additionally made several comments during closing argument regarding plaintiffs' counsel's use of articles to cross-examine the defense experts. The Werdens allege that their counsel was personally attacked through these comments concerning the articles. We disagree and find no error in defense counsel's comments concerning the articles. These statements were fair commentary on the evidence presented, and defense counsel did not insinuate that the articles had been used unfairly.
 {¶ 63} In summary, we conclude that although defense counsel did make several inappropriate comments during the trial, these comments did not create an atmosphere of passion or prejudice,[37] and they did not deprive the Werdens of a fair and impartial trial. The ninth assignment of error is overruled.
 Evidentiary Issues A. New Opinions at Trial {¶ 64} The Werdens' fourth assignment of error alleges that the trial court erred in striking a portion of the testimony from their expert Dr. Williams. Dr. Williams testified at trial that CHMC's recordkeeping fell below the standard of care. Williams testified that he had a difficult time discerning from the medical records what went on during Clayton's treatment. Defense counsel objected to this testimony, alleging that it was a surprise that had not been disclosed at Dr. Williams' deposition or later supplemented.
 {¶ 65} After reviewing Dr. Williams' deposition testimony with the parties, the trial court concluded that Dr. Williams' trial opinion regarding recordkeeping was a surprise. The trial court struck all of Dr. Williams' testimony on this issue.
 {¶ 66} Because of the broad discretion granted to the trial court concerning the admission and the exclusion of evidence, we will not reverse its decision absent a clear abuse of discretion.[38] An abuse of discretion "connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court."[39]
 {¶ 67} We note that the purpose of the discovery rules is to eliminate unfair surprise caused by the presentation of undisclosed opinions at trial.[40] A party must provide "updated and complete discovery regarding the substance of expert testimony."[41]
 {¶ 68} During his deposition, Dr. Williams criticized CHMC's system of rotating physicians and stated that it was difficult to determine who was in charge. This criticism concerned the "continuity of care" and did not directly attack the recordkeeping of CHMC. But the Werdens argue that it was clear from the deposition that Dr. Williams was critical of CHMC's recordkeeping because, along with two depositions, the medical records were his sole source of information regarding the continuity of care.
 {¶ 69} While we might have reached a different conclusion than the trial court, we cannot conclude that an abuse of discretion occurred. The trial court reviewed Dr. Williams' deposition testimony in detail with the parties and was correct in its conclusion that Dr. Williams never directly criticized CHMC's recordkeeping in his deposition. The trial court did not act unreasonably or arbitrarily, and we overrule the Werdens' fourth assignment of error.
 {¶ 70} The Werdens' sixth assignment of error concerns Dr. Harris, who was called as a witness independently by both parties. Dr. Harris was a pediatric hematologist/oncologist at CHMC. He did not directly treat Clayton because of a prior relationship with the Werden family, but he was often consulted during Clayton's care and stayed informed of Clayton's situation.
 {¶ 71} The Werdens argue that the trial court erred in allowing Dr. Harris to provide new, undisclosed opinions at trial. They allege that they were unfairly surprised by Dr. Harris' testimony that it would not have been proper to do an exploratory laparotomy on Clayton while he was suffering from typhlitis. Typhlitis is an inflammation and infection of the intestinal wall often associated with aplastic anemia. But our review of the record indicates that this opinion was not a surprise. During his deposition, Dr. Harris stated that "surgery for typhlitis is a very controversial area, and most people do not recommend taking a patient right into surgery. Most typhlitis is treated with antibiotics and good supportive care * * *. The reason that we generally don't recommend surgery right off is that doing bowel surgery on a patient who is septic appearing and has a neutrophil count of zero often results in death from overwhelming sepsis that can't be controlled." The Werdens had notice that Dr. Harris did not think that an exploratory laparotomy was proper.
 {¶ 72} The Werdens next refer to Dr. Harris' statement that, after seeing Clayton's bone-marrow report from September 11, 1996, he would have expected Clayton's ANC to be less than 200 in two weeks. We again conclude that the Werdens were not surprised by this statement. Dr. Harris alluded to this opinion at his deposition, when he stated that it was not uncommon for a patient's ANC to drop as rapidly as Clayton's did. Dr. Harris stated that "one of the typical scenarios is exactly what Clayton did, which is to come in still with a good neutrophil count and over a period of two weeks or so to have your neutrophil count fall out to zero." The record additionally indicates that the Werdens questioned Dr. Harris on this issue themselves, and raised no objection to his statement that Clayton's ANC would have been zero shortly. Dr. DeLaat and CHMC were entitled to question Dr. Harris on this issue raised by the Werdens.
 {¶ 73} The Werdens additionally argue that several of Dr. Harris' statements concerning Fanconi's anemia were new opinions rendered at trial. Dr. Harris testified at trial that it normally took one to two weeks to obtain the results of a DEB test, that Fanconi's anemia had to be ruled out before beginning a definitive therapy, and that it would be below the standard of care to begin such a therapy before ruling out Fanconi's anemia. While Dr. Harris did not directly reveal these opinions at his deposition, he certainly alluded to them. Dr. Harris stated during his deposition that a doctor must "do the evaluation with the bone marrow aspirate and biopsy and various things to rule out different types of aplastic anemia or other causes of things that look like aplastic anemia, [such as] Fanconi anemia." To the extent that these statements concerning DEB testing and Fanconi's anemia were new opinions, the trial court did not abuse its discretion in allowing them. These opinions did not inject a new theory into the case.[42]
 {¶ 74} The Werdens also refer us to Dr. Harris' statement that, when a patient had a matched sibling donor, it took "generally a few weeks, three weeks, four weeks, something like that" from diagnosis to transplant. But this was not a new opinion. In both his deposition and during the Werdens' case-in-chief, Dr. Harris testified that treatment, whether immunosuppressive therapy or a matched-sibling transplant, could not have begun until HLA typing and DEB testing had taken place. He testified that generally treatment occurred within two to three weeks of diagnosis.
 {¶ 75} Lastly, the Werdens argue that Dr. Harris' statement that patients with an ANC of less than 200 had the worst outlook was a new opinion. Although Dr. Harris did not directly state this opinion at his deposition, we cannot conclude that the Werdens were surprised by it. Dr. Harris discussed responses to immunosuppressive therapy during his deposition. He stated that "response to * * * immunosuppressive therapy works best if there is a marrow for it to work on, if there is still some functional marrow in there." Dr. Harris also discussed specific numeric ANCs. He referred to an ANC of 2,500 as a "reasonable average." He referred to an ANC of 500 as "safe." It is clear that the lower a patient's ANC, the fewer cells they have to fight an infection.
 {¶ 76} We further note that the Werdens questioned Dr. Harris on this issue themselves. At trial, they asked Dr. Harris about Clayton's biopsy from September 11, 1996. Dr. Harris responded that "the marrow was essentially dead at that time. There was just nothing there." Given Dr. Harris' deposition testimony, as well as the testimony elicited by the Werdens at trial, we conclude that Dr. Harris' opinion was not a surprise.
 {¶ 77} In this assignment of error, the Werdens also refer us to several of Dr. Harris' trial statements that contradicted his deposition testimony. However, in each instance, the Werdens impeached Dr. Harris with the statements from his deposition. We conclude that this removed any prejudice resulting from the contradictions.
 {¶ 78} Because the trial court did not abuse its discretion in allowing Dr. Harris' opinions to stand,[43] we overrule the sixth assignment of error.
 B. Use of a Website Page in Cross-Examination {¶ 79} In their fifth assignment of error, the Werdens argue that the trial court erred by permitting defense counsel to use hearsay in its cross-examination of Dr. Williams.
 {¶ 80} Dr. Williams testified that he was the laboratory director at Oakland Children's Hospital. His administrative responsibilities included oversight of the hospital's subsidiary laboratories, one of which was an HLA laboratory. Dr. Williams did not work directly in the HLA laboratory, but testified that he had become acquainted with the reasonable turnaround timing of HLA testing.
 {¶ 81} Dr. Williams opined that, in Clayton's case, the seven-day period between the blood draw and the receipt of the HLA test results was unduly long. He testified that, in his hospital's HLA laboratory, "we turn out our HLA results in two days. National research laboratories * * *, their turnaround time is typically two to three days, sometimes up to four days. So a turnaround time of a full week, you've lost about three or four days."
 {¶ 82} On cross-examination, Dr. Williams admitted that, in Clayton's case, he was aware that the preliminary HLA test results had actually become available within five days.
 {¶ 83} Dr. Williams testified that he was aware of the information that would be communicated from his hospital's HLA laboratory to physicians regarding the amount of time it would take to report HLA test results. Defense counsel presented Dr. Williams with a copy of a page from the Oakland Children's Hospital website. The page contained a document co-authored by the hospital's HLA laboratory director and transplantation service director. The document was addressed to physicians and indicated that a minimum of two weeks was necessary for the production of HLA test results.
 {¶ 84} Dr. Williams acknowledged that he was familiar with the website document. But his position was that the hospital communicated information to physicians about the time required for testing, not through the hospital's website, but by direct communication between a physician and the hospital's laboratories.
 {¶ 85} On appeal, the Werdens argue that the trial court erred by admitting the document into evidence because it was hearsay. First, we note that the trial court refused to admit the website document into evidence. Moreover, the document was not hearsay,[44] and it was properly used for impeachment purposes.[45] We overrule the fifth assignment of error.
 C. Expert Testimony {¶ 86} In their thirteenth assignment of error, the Werdens argue that the trial court erred by not limiting the number of expert witnesses called by Dr. DeLaat and CHMC. We review the trial court's decision for an abuse of discretion.[46]
Evid.R. 403(B) gives the trial court discretion to limit testimony "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."[47]
 {¶ 87} Dr. DeLaat herself testified, and she also presented testimony from Drs. Harris and Mazewski. Drs. DeLaat and Mazewski were directly involved in treating Clayton, and Dr. Harris was intimately familiar with Clayton's situation throughout his care at CHMC. As Clayton's treating physicians, they were entitled to testify regarding "the proper standards of care called for under the given circumstances and could have rendered an opinion as a qualified expert."[48]
 {¶ 88} Dr. DeLaat additionally presented testimony from Jeffrey M. Lipton, M.D., Ph.D., a pediatric hematologist/oncologist. CHMC presented testimony from Harley Aaron Rotbart, M.D., a specialist in pediatric infectious diseases, Neal Young, M.D., a hematologist, and Jeffrey Hord, M.D., a pediatric hematologist/oncologist.
 {¶ 89} Dr. Rotbart testified solely concerning typhlitis. He discussed the condition in great detail, and his testimony did not overlap with the other expert witnesses. Drs. Lipton, Young, and Hord each testified regarding the standards of care relevant to various issues raised during the litigation. While certain aspects of their testimony differed, our review of the record does reveal duplicative testimony from these witnesses.
 {¶ 90} But the standard-of-care testimony related directly to the Werdens' theory of medical malpractice. We conclude that, despite its cumulative nature, the testimony's probative value outweighed any potential harm. The thirteenth assignment of error is overruled.
 {¶ 91} The Werdens' eighth and fifteenth assignments of error concern defense expert Dr. Lipton. For clarity, we address these two assignments out of order.
 {¶ 92} In their fifteenth assignment of error, the Werdens allege that the trial court erred in not applying Evid.R. 601(D) to Dr. Lipton. The Werdens argue that because Dr. Lipton did not devote 75% of his professional time to active clinical practice, he was not an expert competent to testify regarding the relevant standard of care.
 {¶ 93} Evid.R. 601(D) provides that a person may give expert testimony concerning liability if, among other qualifications, "the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school."[49] After Evid.R. 601 was amended in 1991, "the requirement that an expert medical witness devote three-fourths of his or her time to active clinical practice or instruction was reduced to at least one-half."[50] Thus, Dr. Lipton was competent to testify if at least half of his professional time was spent in active clinical practice. We will not reverse the trial court's decision to allow Dr. Lipton to testify absent an abuse of discretion.[51]
 {¶ 94} Evid.R. 601 does not define "active clinical practice." The purpose of the rule requiring active clinical practice is to "preclude testimony by the physician who earns his living or spends much of his time testifying against his fellows as a professional witness, and to prevent those whose lack of experiential background in the very field they seek to judge, the clinical practitioner, * * * from expressing those opinions for pay or otherwise."[52]
 {¶ 95} At trial, Dr. Lipton testified that he was the chief of the pediatric hematology and oncology and stem-cell transplantation divisions at Schneider Children's Hospital in New York. His responsibilities included teaching residents and fellows through an accredited medical school program at the hospital. The hospital had both an accredited pediatric training program and an accredited hematology and oncology fellowship program.
 {¶ 96} Dr. Lipton testified that his professional time was spent in the following manner: (1) forty percent on research (eighty to ninety percent of which was clinical research); (2) twenty-five percent seeing a variety of clinical patients; and (3) ten percent supervising the patient care rendered by hospital residents and fellows as part of their training. This division of time satisfied the competency requirements of Evid.R. 601(D).
 {¶ 97} It is clear from the record that Dr. Lipton had extensive experience in clinical practice and was not a "professional witness." We cannot conclude that the trial court abused its discretion in allowing him to testify as an expert. The fifteenth assignment of error is overruled.
 {¶ 98} In their eighth assignment of error, the Werdens allege that the trial court erred in allowing Dr. Lipton to speculate that Clayton was destined to die.
 {¶ 99} Defense counsel asked Dr. Lipton to give his opinion, within a reasonable medical probability, whether Clayton would have responded to immunosuppressive treatment if it had been started earlier. Dr. Lipton responded, "My opinion is that the biology of his aplastic anemia was borne out by the lack of his response over a period of time and that he unfortunately, and very sadly so, was destined not to respond to this therapy."
 {¶ 100} On cross-examination, Dr. Lipton stated that he was not familiar with any publication supporting his opinion. The Werdens argue that Dr. Lipton's testimony on this issue should have been stricken because it was a personal observation unsupported by any factual or evidentiary basis.
 {¶ 101} The trial court allowed Dr. Lipton's testimony to stand over the Werdens' motion to strike. We review the trial court's decision for an abuse of discretion.[53]
 {¶ 102} Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:
 {¶ 103} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 104} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 105} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information * * *."
 {¶ 106} Dr. Lipton properly rendered his opinion under this rule. His testimony concerned matters beyond the knowledge of laypersons. And Dr. Lipton clearly possessed the specialized knowledge necessary to testify regarding symptoms and treatment of aplastic anemia. He was the Chief Pediatric Hematologist and Oncologist at Schneider's Children's Hospital in New York. He specialized in bone-marrow failure and bone-marrow transplantation, and had published on aplastic anemia.
 {¶ 107} Moreover, the fact that no studies had been published on Dr. Lipton's opinion did not require the exclusion of his testimony. Dr. Lipton's opinion was based on his extensive experience in the field of pediatric hematology and oncology. He supported his opinion by stating that Clayton had already experienced damage to his cells that precluded a response to the immunosuppressive treatment. Dr. Lipton termed this a refractory response. He stated that "[w]hen you are refractory to a treatment, it means that no treatment will cause a cellularity response. You don't improve with treatment. * * * The reasons why you might not respond are many, but you are not responding refractorily."
 {¶ 108} Dr. Lipton further provided an explanation regarding the absence of publication on his theory. To conduct a study on this topic, a physician had to collect data by withholding treatment from various patients and by initiating therapy on different dates. Dr. Lipton stated both that there were not enough patients suffering from aplastic anemia to conduct such a study, and that such a study would have been unethical because of the necessity to withhold treatment in order to validate results.
 {¶ 109} We conclude that the trial court did not abuse its discretion in allowing Dr. Lipton's opinion to stand. We overrule the eighth assignment of error.
 D. Anecdotal Testimony {¶ 110} In their tenth assignment of error, the Werdens allege that the trial court erred in allowing defense counsel to elicit anecdotal testimony from Dr. Harris. The Werdens argue that Dr. Harris generally mentioned various studies and literature without specifying the particular studies or literature he was referring to, thus preventing effective cross-examination.
 {¶ 111} The Ohio Supreme Court has recently addressed an expert witness' general reference to studies and literature.[54] The court concluded that experts are permitted to make such general references when the items referred to have helped to form the basis of the expert's opinion.[55] "Because experts are permitted to base their opinions on their education, including their review of professional literature, training, and experience, it follows that experts are also permitted to testify regarding that information."[56]
 {¶ 112} When asked whether the initiation of immunosuppressive therapy 23 days after diagnosis was within the standard of care, Dr. Harris stated that "there are numerous articles in the literature that [show] that the median day of starting therapy is generally past that time."
 {¶ 113} Dr. Harris' reference to "articles" and "literature" was used to support his opinion regarding the timing of immunosuppressive therapy. This was proper.
 {¶ 114} Dr. Harris additionally stated that "[t]here are a couple of studies in which the timing seems to [a]ffect the percentage of patients who respond. But there are many, many studies which show that it is not a factor, so the vast majority do not show the correlation."
 {¶ 115} Dr. Harris did not directly testify that his opinion was based on these "studies." But the reference was clearly used to support his opinion that the timing of immunosuppressive therapy was not an automatic predictor of a patient's survival. Furthermore, he did not offer direct statements from these studies to be considered independently.[57]
 {¶ 116} We conclude that the trial court did not abuse its discretion in allowing Dr. Harris to refer generally to other studies.[58] The tenth assignment of error is overruled.
 E. Scope of Recross-Examination and Re-redirect {¶ 117} In their third assignment of error, the Werdens allege that the trial court erred in allowing improper cross-examination of Dr. Trigg. They specifically argue that it was improper to allow defense counsel to impeach Dr. Trigg on recross-examination, and then to bar evidence of rehabilitation on re-redirect examination. We note that Dr. Trigg did not testify in person, but rather his video trial deposition was played for the jurors.
 {¶ 118} During recross-examination, defense counsel questioned Dr. Trigg about a prior case from Michigan in which he had testified as an expert. In this Michigan case, the plaintiff's cause of action had been dismissed because the appellate court determined that Dr. Trigg's deposition testimony contradicted his sworn affidavit concerning the appropriate standard of care.
 {¶ 119} After the completion of recross-examination, on this prior case as well as on other issues, the trial court did not allow the Werdens' re-redirect examination of Dr. Trigg to be played for the jurors.
 {¶ 120} We review the trial court's control of the questioning of witnesses for an abuse of discretion.[59]
Evidence concerning Dr. Trigg's testimony in the prior case from Michigan was used to impeach his credibility and was permissible under Evid.R. 611(B). And where the Werdens' further questioning of Dr. Trigg provided minimal rehabilitation and was cumulative of his earlier testimony, we find no abuse of discretion in the exclusion of that testimony. While the trial court should not have admitted into evidence certain transcripts from the Michigan case,[60] we cannot say that the error materially prejudiced the Werdens in the context of the entire trial. The third assignment of error is overruled.
 Jury Instructions {¶ 121} In their seventh assignment of error, the Werdens argue that the trial court erred by failing to properly instruct the jury in three respects. They contend that the trial court erred by refusing to instruct the jury on the loss-of-chance doctrine, by giving an "alternate methods" instruction, and by failing to instruct the jury that the Werdens were not required to prove the specific length of time that their son would have lived.
 {¶ 122} A jury instruction is proper if it correctly states the law and is supported by the evidence.[61] In our review, we must determine whether the record contains sufficient evidence to support the giving of a particular instruction.[62]
 {¶ 123} First, the Werdens argue that the trial court erred by failing to instruct the jury on "loss of chance." In Robertsv. Ohio Permanente Medical Group, Inc.,[63] the Ohio Supreme Court held that a plaintiff could maintain an action for the loss of a less-than-even chance of recovery or survival by presenting expert medical testimony showing that a health-care provider's negligence increased the risk of harm to the plaintiff. Essentially, Roberts relaxed the traditional rules of causation so that a health-care provider is no longer "insulated from liability where there is expert medical testimony showing that he or she reduced the patient's chances of survival."[64] But liability for lost chance is predicated upon proof of the defendant's negligence.[65] In this case, the jury concluded that no negligence had occurred, so the Werdens were not prejudiced by the court's refusal to give a loss-of-chance instruction.
 {¶ 124} Next, the Werdens argue that the court erred by giving an "alternate methods" instruction. This type of instruction informs the jury that different methods of treatment may be used, and that the selection of one method of treatment over another is not in itself negligence.[66]
 {¶ 125} In this case, the Werdens' expert, Dr. Trigg, testified that immunosuppressive therapy should have begun without first ruling out Fanconi's anemia, and that surgery should have been initiated to resolve the typhlitis. But defense experts disagreed. Drs. Young, Hord, and DeLaat testified that immunosuppressive therapy should not have commenced without ruling out Fanconi's anemia. And Dr. Rotbart testified that exploratory surgery would not have been advisable because it was extraordinarily risky and dangerous for neutropenic and thrombocytopenic patients, "like walking blindfolded through a landmine field." According to Dr. Rotbart, a treatment consisting of antibiotics and supportive care was proper. Because the record contains evidence that more than one method of treatment was available for Clayton's anemia and typhlitis, the trial court did not err in giving the "alternate methods" instruction to the jury.
 {¶ 126} Finally, the Werdens contend that the defendants had "hammered" on their witnesses because they "could not tell how long this particular [patient] would live." So the Werdens requested that the trial court instruct the jury, as a "curative" measure, that plaintiffs need not prove the specific length of time that the patient may have lived.
 {¶ 127} The Werdens' characterization of defense questioning of Drs. Trigg and Williams is not supported by the record. Indeed, one of the questions that they allege to have been harsh was a question by their own counsel, not the defense. No curative instruction was required.
 {¶ 128} Moreover, the instruction that the Werdens requested was addressed to issues of proximate cause and damages.[67]
Given that the jury found no negligence, we cannot say that the Werdens were prejudiced by the trial court's failure to give the instruction. Accordingly, we overrule the seventh assignment of error.
 Informed Consent {¶ 129} The Werdens' eleventh and twelfth assignments of error concern their claim for lack of informed consent. In their eleventh assignment of error, they allege that the trial court erred in allowing parol evidence regarding informed consent.
 {¶ 130} The consent form that the Werdens signed was written by Dr. Harris. They argue that Dr. Harris' testimony explaining what he meant when he wrote the consent form, as well as explanations from Drs. DeLaat, Mazewski, and Harris concerning what they believed they had told the Werdens, was parol evidence.[68]
 {¶ 131} In support of their argument, the Werdens rely on R.C. 2317.54, which discusses consent to a surgical or medical procedure. They specifically rely on language from the statute stating that "no evidence shall be admissible to impeach, modify, or limit the authorization for performance of the procedure or procedures set forth in such written consent."[69]
 {¶ 132} The Werdens' reliance on this statute is misplaced. R.C. 2317.54 concerns written consent; but in their complaint the Werdens raised a claim of lack of informed consent. There is a subtle but distinct difference between these issues.
 {¶ 133} This difference has been recognized by the Eleventh Appellate District, which has stated that "[a]ppellant's argument * * * interchanges the concept of informed consent with the more narrow question of a written consent form. R.C. 2317.54
provides that written consent is presumed to be valid and effective if it conforms to the specific requirements described by that section. The use of a written consent form under R.C.2317.54 has no separate impact on the common law rights and liabilities that exist between a physician and a patient."[70]
 {¶ 134} The elements of a lack-of-informed-consent claim were established by the Ohio Supreme Court in Nickell v.Gonzalez.[71] The court held that a party lacks informed consent under the following circumstances:
 {¶ 135} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
 {¶ 136} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
 {¶ 137} "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."[72]
 {¶ 138} In the defense of a claim of lack of informed consent, an explanation of the meaning of the consent form, as well as testimony concerning what information a physician provided to a patient, is certainly relevant. The trial court did not abuse its discretion in allowing this testimony.[73]
The eleventh assignment of error is overruled.
 {¶ 139} In their twelfth assignment of error, the Werdens argue that the trial court erred in denying their motion for judgment notwithstanding the verdict ("JNOV") on the issue of informed consent.
 {¶ 140} When reviewing a motion for JNOV, "the trial and appellate courts, without weighing the evidence, must construe the evidence most strongly in favor of the non-moving party, and determine whether reasonable minds could only conclude in favor of the movant. If the evidence admits of only one conclusion[,] a motion for JNOV is appropriately granted."[74] If reasonable minds could reach different conclusions, the motion must be denied.[75]
 {¶ 141} In their appellate brief, the Werdens argue that because they were provided with inaccurate statistics regarding the likelihood of Clayton experiencing a successful response to immunosuppressive therapy, they lacked informed consent.
 {¶ 142} This court has held that expert testimony is necessary to establish certain elements of an informed-consent claim. "Expert testimony is required to establish what the claimed undisclosed material risks and dangers associated with a surgical procedure are, and if disputed, whether those particular undisclosed risks did in fact materialize and cause the patient's injuries."[76]
 {¶ 143} The Werdens presented expert testimony from Dr. Trigg. Dr. Trigg gave what he regarded as an appropriate explanation, in terms of percentages, of the likelihood of a successful response to various treatment programs, including immunosuppressive therapy.
 {¶ 144} But Dr. Trigg did not testify that these percentages were a material risk or danger associated with the treatment. And, most telling, Dr. Trigg did not testify that Clayton's chance of a successful response to immunosuppressive therapy was related to the proximate cause of his death. Dr. Trigg specifically testified that Clayton died from an infectious process.
 {¶ 145} We are further convinced that a reasonable person in Clayton's situation would not have declined the immunosuppressive therapy if different percentages of success had been explained.[77] Because of his extremely low ANC, Clayton suffered from severe aplastic anemia. None of Clayton's immediate or extended family members was a matched donor for him. A reasonable person would most likely have chosen to receive the immunosuppressive therapy while awaiting an unrelated donor, rather than to await a donor without treatment.
 {¶ 146} Because reasonable minds could have concluded that the Werdens did not lack informed consent, JNOV was inappropriate.
 {¶ 147} In addition to alleging that they were misinformed about the likelihood of Clayton experiencing a successful response to immunosuppressive therapy, the Werdens raised a second argument in their motion for JNOV before the trial court. They argued that they were not informed about the accuracy of finding a matched donor from a sibling as opposed to an extended family member. As a result, they delayed immunosuppressive therapy to test extended family members.
 {¶ 148} The Werdens presented expert testimony to support this argument. Dr. Trigg testified that the delay in initiation of the immunosuppressive therapy compromised Clayton's care. But the jurors heard additional testimony that the Werdens had been counseled not to delay therapy to test extended family, and that the timing of the therapy was within the standard of care and had no effect on Clayton's response. JNOV was inappropriate because reasonable minds could have reached more than one conclusion on this issue.
 {¶ 149} We overrule the twelfth assignment of error.
 FDA Claims {¶ 150} In their fourteenth assignment of error, the Werdens argue that the trial court erred in not allowing them to pursue claims against Dr. Zwerdling and CHMC regarding FDA violations. The trial court granted summary judgment on all claims against Dr. Zwerdling, as well as granting a motion in limine excluding the Werdens from presenting evidence concerning FDA violations.
 {¶ 151} Because we have already concluded that summary judgment was appropriately granted to Dr. Zwerdling, we only discuss the propriety of the motion in limine.
 {¶ 152} The motion in limine excluded evidence that the Werdens sought to introduce regarding an FDA investigation of Clayton's care. This investigation identified several FDA violations. All the violations related to Dr. Zwerdling and concerned incidents that occurred after Clayton's death, not during his care.
 {¶ 153} The trial court did not abuse its discretion in granting this motion.[78] Dr. DeLaat was the sole doctor on trial, and the FDA violations were not related in any manner to her care of Clayton. Further, the Werdens' medical malpractice theory centered upon the standard of care Clayton received. But the FDA violations stemmed from occurrences that took place after Clayton passed away. Evidence of such violations was irrelevant to Dr. DeLaat's and CHMC's liability, and would have both confused the jurors and prejudiced the defendants. We overrule the fourteenth assignment of error.
 Conclusion {¶ 154} Through our review of the record and the errors assigned in this case, we have become intimately familiar with Clayton's illness, as well as with the care and treatment he received.
 {¶ 155} Our review and analysis leads us to conclude that summary judgment was appropriately granted, and that the Werdens received a fair trial on their remaining claims. Accordingly, we affirm the judgment of the trial court.
Judgment affirmed.
Painter, P.J., and Sundermann, J., concur.
[1] The Werdens also argue that they were denied due process because the motions for summary judgment were filed without leave of court in violation Civ.R. 56(A). Because this argument is repeated in the Werdens' second assignment of error, which attacks the entry of summary judgment, we address the argument in our disposition of that assignment of error.
[2] See Stores Realty Co. v. Cleveland (1975),41 Ohio St.2d 41, 43, 322 N.E.2d 629.
[3] Wissel v. Ohio High School Athletic Assn. (1992),78 Ohio App.3d 529, 533, 605 N.E.2d 458.
[4] Berger v. Berger (1981), 3 Ohio App.3d 125, 131,443 N.E.2d 1375, overruled on other grounds in Brickman Sons, Inc.v. Natl. City Bank, 106 Ohio St.3d 30, 2005-Ohio-3559,830 N.E.2d 1151.
[5] Id.
[6] Goldfuss v. Davidson, 79 Ohio St.3d 116, 121,1997-Ohio-401, 679 N.E.2d 1099.
[7] Id., syllabus.
[8] State ex rel. Berger v. McMonagle (1983),6 Ohio St.3d 28, 30-31, 451 N.E.2d 225; see, also, State v. Fox,69 Ohio St.3d 183, 190, 1994-Ohio-513, 631 N.E.2d 124; Pocker v. Brown
(C.A.6, 1987), 819 F.2d 148 (rejecting federal constitutional challenge to Ohio's appointment of retired judges as trial judges).
[9] Berger v. McMonagle, supra, at 30-31, 451 N.E.2d 225.
[10] See Wissel, supra, at 533, 605 N.E.2d 458.
[11] Id. at 532, 605 N.E.2d 458.
[12] See Goldfuss, supra, at 121, 1997-Ohio-401,679 N.E.2d 1099.
[13] Lachman v. Wietmarschen, 1st Dist. No. C-020208, 2002-Ohio-6656, at ¶ 6.
[14] State Farm Mut. Auto Ins. Co. v. Loken, 5th Dist. No. 04-CA-40, 2004-Ohio-5074, at ¶ 34, citing Stewart v. ClevelandClinic Foundation (1999), 136 Ohio App.3d 244, 254,736 N.E.2d 491.
[15] See Hines v. Aetna Casualty Sur. Co. (Jan. 9, 1992), 8th Dist. No. 59600.
[16] See Doe v. Shaffer, 90 Ohio St.3d 388, 390,2000-Ohio-186, 738 N.E.2d 1243.
[17] See Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105,1996-Ohio-336, 671 N.E.2d 241.
[18] Vahila v. Hall, 77 Ohio St.3d 421, 429, 1997-Ohio-259,674 N.E.2d 1164, citing Drescher v. Burt (1996),75 Ohio St.3d 280, 293, 662 N.E.2d 264.
[19] Civ.R. 56(E); Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 526 N.E.2d 798.
[20] (1976), 46 Ohio St.2d 127, 346 N.E.2d 673.
[21] Id., paragraph one of the syllabus.
[22] Id. at 131, 346 N.E.2d 673, quoting Davis v. VirginianRy. Co. (1960), 361 U.S. 354, 357, 80 S.Ct. 387.
[23] Id. at 131-132, 346 N.E.2d 673.
[24] Berdyck v. Shinde, 66 Ohio St.3d 573, 578,1993-Ohio-183, 613 N.E.2d 1014, citing Klema v. St. Elizabeth'sHosp. of Youngstown (1960), 170 Ohio St. 519, 166 N.E.2d 765.
[25] Comer v. Risko, 106 Ohio St.3d 185, 190, 2005-Ohio-4559,833 N.E.2d 712, at ¶ 25.
[26] Albain v. Flower Hosp. (1990), 50 Ohio St.3d 251, 259,553 N.E.2d 1038 (overruled on other grounds); see, also, Sullinsv. Univ. Hosps. of Cleveland, 8th Dist. No. 80444, 2003-Ohio-398.
[27] Maggio v. Cleveland (1949), 151 Ohio St. 136,84 N.E.2d 912, paragraph two of the syllabus.
[28] Id.
[29] Bowden v. Annenberg, 1st Dist. No. C-040499,2005-Ohio-6515, ¶ 19, citing State v. Austin (Dec. 17, 1986), 1st Dist. No. C-860148.
[30] See id.
[31] Pesek v. Univ. Neurologists Assn., 87 Ohio St.3d 495,501, 2000-Ohio-483, 721 N.E.2d 1011.
[32] Roetenberger v. The Christ Hosp., 163 Ohio App.3d 555,2005-Ohio-5205, 839 N.E.2d 441, ¶ 9.
[33] Clark v. Doe (1997), 119 Ohio App.3d 296, 307,695 N.E.2d 276, citing Cusumano v. Pepsi-Cola Bottling Co. (1967),9 Ohio App.2d 105, 223 N.E.2d 477.
[34] Fehrenbach v. O'Malley, 164 Ohio App.3d 80, 91,2005-Ohio-5554, 841 N.E.2d 350, ¶ 23.
[35] Goldfuss, supra, at 121, 1997-Ohio-401,679 N.E.2d 1099.
[36] Bowden, supra, 2005-Ohio-6515, at ¶ 19.
[37] Fehrenbach, supra, at 91, 2005-Ohio-5554,841 N.E.2d 350, at ¶ 23.
[38] Bernal v. Lindholm (1999), 133 Ohio App.3d 163, 176,727 N.E.2d 145.
[39] Pembaur v. Leis (1982), 1 Ohio St.3d 89, 91,437 N.E.2d 1199.
[40] Fehrenbach, supra, at 100, 2005-Ohio-5554,841 N.E.2d 350, at ¶ 59.
[41] Id., citing Shumaker v. Oliver B. Cannon Sons, Inc.
(1986), 28 Ohio St.3d 367, 370, 504 N.E.2d 44.
[42] See id. at ¶ 59.
[43] Bernal, supra, at 176, 727 N.E.2d 145.
[44] See Evid.R. 801(C).
[45] See Evid.R. 616(C).
[46] Bernal, supra, at 176, 727 N.E.2d 145.
[47] Evid.R. 403(B).
[48] See Thomas v. Mantanguihan (June 30, 1982), 1st Dist. No. C-810776.
[49] Evid.R. 601(D).
[50] See Staff Notes to Amended Evid.R. 601 (July 1, 1991).
[51] See Lovejoy v. Hopkins, 9th Dist. No. 20490, 2001-Ohio-1367, citing State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343, paragraph two of they syllabus.
[52] Aldridge v. Garner, 159 Ohio App.3d 688, 2005-Ohio-829,825 N.E.2d 201, ¶ 11, citing McCrory v. State (1981),67 Ohio St.2d 99, 103, 423 N.E.2d 156.
[53] Bernal, supra, at 176, 727 N.E.2d 145.
[54] Beard v. Meridia Huron Hosp., 106 Ohio St.3d 237,2005-Ohio-4787, 834 N.E.2d 323.
[55] Id. at ¶ 26.
[56] Id.
[57] See id. at ¶ 32.
[58] Bernal, supra, at 176, 727 N.E.2d 145.
[59] See State v. Faulkner (1978), 56 Ohio St.2d 42, 46,381 N.E.2d 934; State v. Wilson (1972), 30 Ohio St.2d 199, 204,283 N.E.2d 632.
[60] Evid.R. 616(C).
[61] Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585,591, 575 N.E.2d 828.
[62] Id.
[63] 76 Ohio St.3d 483, 1996-Ohio-375, 668 N.E.2d 480.
[64] Roberts, supra, at 488, 1996-Ohio-375, 668 N.E.2d 480.
[65] Roberts, supra, at 485, 1996-Ohio-375, 668 N.E.2d 480.
[66] Pesek, supra, at 498, 2000-Ohio-483, 721 N.E.2d 1011.
[67] The requested instruction was adapted from the holding ofTaylor v. C. Lawrence Decker, M.D., Inc. (1986),33 Ohio App.3d 118, 514 N.E.2d 754.
[68] We note that the Werdens' appellate brief provides no citations to the record concerning the comments of Drs. DeLaat and Mazewski.
[69] R.C. 2317.54.
[70] Foreman v. Hsu (Sept. 30, 1998), 11th Dist. No. 96-T-5559.
[71] (1985), 17 Ohio St.3d 136, 477 N.E.2d 1145.
[72] Id. at 139.
[73] Bernal, supra, at 176, 727 N.E.2d 145.
[74] Shepherd v. Westlake (1991), 76 Ohio App.3d 3, 10,600 N.E.2d 1095.
[75] Posin v. A.B.C. Motor Court Hotel, Inc. (1976),45 Ohio St.2d 271, 275, 344 N.E.2d 334.
[76] Valerius v. Freeman (Oct. 19, 1994), 1st Dist. No. C-930658.
[77] See Kilgallion v. Children's Hosp. Med. Ctr. (Apr. 15, 1987), 1st Dist. Nos. C-850644 and C8-60342 (a reasonable person in the patient's position would not have declined the surgery if they would have known it contained a risk of paralysis because of the bleak outcome the patient faced without surgery).
[78] See Brokamp v. Mercy Hosp. (1999), 132 Ohio App.3d 850,859, 726 N.E.2d 594, citing State v. Grubb (1986),28 Ohio St.3d 199, 201, 503 N.E.2d 142.